FRANKLIN MOORE, GEORGE FOOT, AND GEORGE F. BAGLEY, PLAINTIFFS IN ERROR, *v.* THE AMERICAN TRANSPORTATION COMPANY.

An act of Congress passed on the 3d of March, 1851, (9 Stat. at L., 635,) entitled "An act to limit the liability of ship owners, and for other purposes," provides that no owner of any ship or vessel shall be liable to answer for any loss or damage which may happen to any goods or merchandise which shall be shipped on board any such ship or vessel, by reason of any fire happening on board the same, unless such fire is caused by design or neglect of such owner, with a proviso that the parties may make such contract between themselves on the subject as they please.

The seventh section provides that this act shall not apply to the owner or owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever used in rivers or inland navigation.

The exception does not include vessels used on the great lakes. Consequently, where goods were consumed by fire upon Lake Erie, without any design or neglect on the part of the owner of the vessel, he was not responsible for the loss.

The act not only exempts the owner from the casualty of fire, but limits his liability in cases of embezzlement or loss of goods on board by the master and others, and also for loss or damage by collisions, and even from any loss or damage occurring without the privity of the owner, to an amount not exceeding the value of the vessel and freight.

THIS case was brought up from the Supreme Court of the State of Michigan, by a writ of error issued under the 25th

VOL. XXIV.      1

section of the judiciary act; the construction of a clause of a statute of the United States (the exception in section 7 of the act of March 3, 1851) being drawn in question, and the decision being against the right set up and claimed by the plaintiffs, in error.

The suit was originally commenced in the Circuit Court for the county of Wayne, in the State of Michigan, holden in the city of Detroit, and was brought by the plaintiffs in error, merchants resident in that city, against the American Transportation Company, a corporation created by the State of New York.

The declaration was in assumpsit, and charged the defendants as common carriers by water, of goods and chattels for hire, by canal boats and steam propellers, from New York to Detroit. It then alleged the delivery of about $3,000 worth of groceries on board the propeller at Buffalo, which were not delivered through the burning of the propeller.

The defendants pleaded the general issue, non assumpsit, and, under the Michigan practice, appended to the plea a notice that the statute of March 3, 1851, would be relied on as exempting the defendants. No replication was filed setting up the exception in the last section of said act, because the practice in that State does not permit such a pleading.

The cause was tried twice. At the first trial, the Circuit Judge ruled in favor of the plaintiffs, instructing the jury that that portion of the act giving the exemption claimed by the defendants was not applicable to the case, but that the vessel was engaged in inland navigation, under the exception, as claimed by the plaintiffs; and accordingly, September 11, 1857, the plaintiffs had a verdict of $3,050.70.

The defendant presented a bill of exceptions, and took a writ of error to the Supreme Court of Michigan, where the verdict was set aside and a new trial granted, upon the ground that the propeller, when navigating Lake Erie, was not engaged in inland navigation under said exception, as claimed by the plaintiff, and held by the court below.

The case is reported in 5 Mich.; (1 Cooley,) 368. November 16, 1858, the new trial was had; and of course it resulted,

under the decision of the appellate court given above, in a verdict for the defendants.

The plaintiffs then filed their bill of exceptions, given at large in the record, showing that they requested the court to charge "that the act of Congress of March 3d, 1851, had no applicability to the case, inasmuch as the 'Spaulding,' being used principally in navigating between the cities of Buffalo and Detroit, by way of Lake Erie and Detroit river, was engaged in river and inland navigation within the exception in the last clause of section 7 of said act;" and that the court refused so to charge, and charged to the contrary, and the plaintiffs duly excepted.

Upon writ of error by the plaintiffs, the Supreme Court of Michigan affirmed the judgment below, in accordance with their former decision, and the plaintiffs brought the case up to this court.

It was argued by *Mr. Walker* and *Mr. Russell* for the plaintiffs in error, and by *Mr. Hibbard* for the defendants. A motion was made to dismiss the writ for want of jurisdiction, but the arguments upon this point will not be reported, nor upon the point of the constitutionality of the act of Congress.

The argument of *Mr. Russell* and *Mr. Walker* upon the main point, for the plaintiffs in error, was as follows:

The question to be decided is, whether a vessel engaged in navigation and commerce between the port of Buffalo, on Lake Erie, and the port of Detroit, on the river Detroit, is within the meaning of said act of Congress, "used in rivers or inland navigation."

While we most cheerfully concede that the intention of the Legislature is to be derived from the language which it has used, yet, in ascertaining that intention, the previous state of the law, the defects to be remedied, and the history of the legislation, may all be appropriately referred to.

Sedgwick on Statutes, 237, 239.

By the common law, the stringent rule in relation to the

liabilities of common carriers was held to be as applicable to common carriers by water as by land.

Morse *v.* Sluc, Ventris, 190, (23 Car., 2d.)

Same, Raymond, 220.

Rich *v.* Kneeland, (11 Jac., 1st,) Cro. Jac., 330.

Dale *v.* Hall, 1 Willson, 281, (A. D. 1750.)

The first limitation of the liability of ship owners was by the act of 7 Geo. II, c. 15, A. D. 1734.

It is not easy to determine what at this time was the liability of ship owners by the Continental law, nor was that law uniform; but it is very clear that they were not held to so strict a liability as by the common law. Thus it would seem, that in case of embezzlement or other wrong, by the master or mariners, that the owner was only liable to the extent of ship and freight.

Abbott on Shipping, 395.

Story on Bailments, sec. 488.

Hunt *v.* Morris, 6 Mart. La., 676; 3 Kent., 218.

The act of Parliament referred to provided substantially for the same thing, and thus put English ships upon an equality with foreign vessels. The special occasion of the passage of this act seems to have been the decision in the case of Boucher *v.* Lawson, which held that owners were, under some circumstances, liable for embezzlements committed by the master, without default of the owner.

Abbott on Shipping, 128, 395.

The liabilities of ship owners were still further limited by the act 26 Geo. III, A. D. 1786. By this act owners were exempted from liability in case of robbery, although not committed by the master or persons employed upon the vessel, and also from all responsibility in case of loss or damage by fire.

Abbott on Shipping, 397, 398.

This act seems to have been suggested by the case of Sutton *v.* Mitchell, 1 Term Reports, 18, which was an attempt to make the owners responsible for a robbery committed at the instigation of a mariner.

Abbott on Shipping, 397.

Two other cases decided the same year (1785) may have had some influence in promoting this legislation.

Forward *v.* Pittard, 1 Term, 27.

Trent Navigation Co. *v.* Wood, 3 Esp., 127.

The liabilities of ship owners were still further limited by 53 Geo. III, c. 159, which exempted owners from all responsibility for any damage, by reason of any act or neglect without their fault or privity, beyond the value of the ship or vessel and freight.

Abbott on Shipping, 398.

The object of all this legislation was to encourage British shipping, and put it at least upon an equality with that of other nations, and it has accordingly been held that these laws were only applicable to British shipping.

The Dundee, 1 Hagg., 113.

Pope *v.* Dogherty, 7 Am. Law Reg., 181.

Although the rule of the common law, in relation to the liability of common carriers, has been fully recognised in this country from its earliest settlement, and the applicability of that rule to carriers by water, and although in many instances ship owners have been held liable for losses by fire occurring without neglect on their part, yet no successful attempt was made to limit their liabilities until the passage of the act of 1851.

2 Kent's Com., 599 and 609.

McClure *v.* Hammond, 1 Bay., 99.

1810, Scheiffelin *v.* Harvey, 6 Johnson, 170.

1815, Elliott *v.* Rossel, 10 Johnson, 1.

*Cases of Fire.*

1834, Harrington *v.* Shaw, 2 Watts, 33.

1823, Stbt. Co. *v.* Bason, Harper, 264.

1838, Patton *v.* McGrath, Dudley, 159.

1843, Gilmore *v.* Carman, 1 S. and M., 279.

1843, Hale *v.* N. J. S. Nav. Co., 15 Conn., 539.

1848, N. J. S. Nav. Co. *v.* Merchants' Bank, 6 How., 334.

These last two cases, which grew out of the burning of the Lexington, very strongly attracted the attention of shipping and commercial men, and led to the enactment of March 3,

1851. Although the law upon this subject was perfectly well settled, losses by fire upon the ocean had been of such rare occurrence, that ship owners had not fully recognised their liabilities until these decisions

The history of that act during its passage is curious, suggestive, and instructive.

23 Congressional Globe, 713—718.

When first introduced into the Senate, the last clause of the act was as follows: "The preceding sections shall not apply to the owner or owners of any canal boat, nor to the owner or owners of any lighter or lighters employed in loading or un-loading vessels, or in transporting goods or other property inland from place to place." Thus limiting the exception to canal boats and lighters engaged in inland commerce, or, in other words, extending the benefits of the law to all other vessels of every description within the jurisdiction of Congress.

The bill had been carefully prepared by the Committee on Commerce, and was called up by Mr. Hamlin, Senator from Maine, one of that committee. He said: "It is a bill which I think is just in its provisions, and it places our commercial marine upon the same basis as that of England."

Its consideration was opposed by several distinguished Senators, and urged by others as a measure of great importance. Mr. Davis, of Massachusetts, said "that it is by a recent decision some two or three years since that the owners of ships have comprehended their liabilities," and urging the consideration of the measure as a system which had been for many years in operation in England, and said, "it is simply putting our merchant marine upon the same footing as that of Great Britain. We are carriers side by side with that nation in competition with them, and we cannot afford to give them any very great advantage over us without affecting our interest very seriously."

Mr. Cass urged its consideration with great earnestness, for similar reasons; and when before the Senate upon its merits, Mr. Hamlin said: "It is true that the changes are most radical from the common law upon the subject, but they are rendered

necessary, first, from the fact that the English common-law system really never had any application in this country; and second, that the English Government has changed the law, which is a very strong and established reason why we should put our commercial marine upon an equal footing with hers. Why not give to those who navigate the ocean as many inducements to do so as England has done? Why not place them upon that great theatre where we are to have the great contest for the supremacy of the commerce of the world? This is what this bill seeks to do, and it asks no more."

Mr. Butler, of South Carolina, opposed the bill, and said: "Great Britain has more interest in relieving itself from liabilities upon the ocean than any other."

Mr. Underwood, of Kentucky, as representing the agricultural interests of the West, opposed the bill, and especially that portion of it exempting the owners of the vessel from liabilities for loss by fire; he said: "The argument is, that we cannot compete with our great rival upon the ocean, with Great Britain, and that we must pass the first section of this bill in order to come into competition with her;" and he thought the bill would be injurious to the agriculturists, who produced articles of commerce, but who were not their own carriers; that it would lessen the security without lessening the cost of freight.

It was to obviate these objections coming from the interior that Mr. Pearce, of Maryland, moved to strike out the clause of the bill, and to insert the clause under consideration: "This act shall not apply to the owners of any canal boat, barge, or lighter, or any vessel of any description whatsoever used in rivers or inland navigation."

Mr. Hamlin, who had charge of the bill, said: "If those who represent the *interior waters* of the country desire such an amendment, I am perfectly willing that it should be made."

Mr. Phelps, of Vermont, living upon the banks of Lake Champlain, opposed the amendment, and said: "If there is any portion of our navigation which is entitled to the benefit of this change in the common law of the country, it is our *inland navigation*. From my own experience in my own imme-

diate neighborhood, of the navigation of the waters of the inland section of the country in which I reside, it is proved that this navigation is more subject to accidents, against which they cannot guard, than is the navigation of the sea. Under these circumstances I am opposed to the amendment, because I think that if the principle which is incorporated in the bill be adopted, it should be adopted in regard to all our navigation, internal as well as external."

Mr. Pearce, who introduced the amendment, said: "The memorials which gave rise to this bill came from that class of our people who were interested in *ocean navigation,* and one of the strongest arguments in support of this bill is, that it would put the ocean navigation of this country upon an equal footing with the ocean navigation of England and other countries. No such argument applies to this case; it is very manifest that the passage of this bill, without this amendment, will operate very disadvantageously to the interests of inland navigation."

Mr. Rantoul was willing to vote for the amendment, because it did not affect those sections directly interested in foreign navigation, and was willing that the other sections should make such arrangements as best suited their purpose.

Mr. Seward opposed the amendment, because it introduced "one system for ships that were engaged in the State of New York, another system for the commerce on our lakes, on Lakes Erie, Ontario and Michigan; one system for the rivers and lakes, and another system for the ocean navigation." "The reasons which lead to the necessity for this bill are applicable to the inland navigation, and not to ocean navigation alone."

Mr. Clayton, of Delaware, said: "I suppose the amendment will apply to lake navigation as well as inland navigation."

Mr. Walker, of Wisconsin, favored the amendment, for the reason "that the great producing interests of the country require it."

Mr. Shields, of Illinois, said: "I also hope the amendment will be adopted. I do not think we have too many guaranties upon our *Western waters* for the safety of either passengers or freight."

Looking, then, at the history of British legislation upon this

subject, and the greater liabilities that rested upon our ship owners, which had been so clearly brought to light by the decisions growing out of the loss of the Lexington, it seems very clear that the purpose of the act was in relation to *ocean* navigation, to place our vessels upon an equality with those of Great Britain, and enable them to compete successfully with British and other foreign shipping for the commerce of the seas. It seems equally clear, that the provisions of the clause in question were intended to be extended as well to commerce upon the lakes as on rivers. -

The British statutes exempting ships from liabilities were not in force in Canada and upon the great lakes, nor was there upon those lakes any real competition between British and American shipping. It already stood upon an equality in relation to legal liability, and, practically, American shipping had the entire monopoly of the commerce.

Is there anything in this exception itself that requires a different construction? We think not.

In the first place, the exception excludes from the operation of the act certain vessels, irrespective of the character of the navigation in which they are engaged, canal boats, barges, and lighters. These, from their very nature, cannot be used in ocean navigation, nor be exposed to its hazards.

Then there is excluded from the operation of the act, "vessels of any description whatsoever used in rivers or inland navigation;" the phrase is sufficiently comprehensive to include everything that floats upon water, if used in the specified way.

Webster's Dict., "Vessel."

The phrase "used in rivers" is too unambiguous to require explanation or construction. -

The remaining question, and which is the question in this case, is, what construction is to be given to the phrase "inland navigation;" shall it be held to embrace navigation upon Lake Erie and our great lakes? That this is the obvious, natural, and popular meaning of the phrase, we think there can be no

doubt. This is admitted by Judge Conklin, who suggests, however, a different construction.

Conklin Ad., 209.

It is now clearly settled, that in the construction of statutes the courts will give to the language used its ordinary and obvious meaning, unless from the statute itself it is clearly apparent that some other meaning was intended.

Sedgwick on Stat. Law, 243, 260, 310, 382.

Tisdale *v.* Comb, 7 Ad. and E., 788.

Lakes are from their very nature *inland,* and must be so, and the navigation upon them must therefore be inland navigation.

5 Am. Encyc., art. "Lake."

4 Nat. Cyc., art. "Canada."

5 Ed. Encyc., art. "Canada."

7 Nat. Cyc., art. "Lake."

Maunder's Scientific Treas., art. "Lake."

Webster's Dict., arts. "Lake" and "Sea."

Thus the Caspian, though sometimes called a sea, is strictly a lake, being a large collection of water in an inland place.

15 Ed. Encyc., art. "Physical Geo.," 608.

5 Amer. Cyc., art. "Lake."

7 Nat. Encyc., art. "Lake."

Webster's Dict., art. "Sea."

The word "inland," as applied to navigation or bodies of water, is used as the correlative of ocean or tide water.

Webster's Dict., "Inland."

We refer to a few only of the many instances in which the terms "inland seas," "inland waters," and "inland navigation," have been used by jurists and by other writers in relation to, or so as necessarily to include, the great lakes.

"Inland Seas," Woodbury, J., 5 How., 495.

"Interior Lakes," Webster Arguendo, 6 How., 378.

"Inland Seas," Taney, Ch. J., 12 How., 453.

"Interior Waters," Daniel, J., 20 How., 314.

"Inland Waters,' Catron, J., 20 How., 401.

"Inland Waters," Clifford, J., 21 How., 22.

"Inland Navigation," Shaw, Ch. J., 11 Pick., 42.

"Inland Navigation," 1 Newberry, Pref. VIII.

"Inland Seas," Arguendo, 1 Newberry, 545.

"Inland Seas," Pratt, J., 3 Mich., 275.

"Inland Navigation," 1 Conk. Adm., 5, 8, 17.

"Inland Waters," 1 Conk. Adm., Pref. VIII.

"Inland Seas," Ed. Cyc., art. "Phys. Geo.," 608.

"Inland Seas," 1 Murray's Hist. of Canada, 22.

"Inland Navigation," Summerville's Phys. Geo., 266.

"Inland Seas," 3 Murray's Encyc. of Geo., 350.

"Inland Seas," Webster in his Buffalo speech, 1833; and in his 1st speech in reply to Hayne.

"Interior Trade," 3 Bancroft's Hist. of U. S., 111.

Indeed, it may well be said, that the great lakes are but expansions of the rivers connecting them, and this is the position taken by eminent geographers, some of whom give the length of the St. Lawrence as commencing at the head of Lake Superior.

4 Nat. Cyc., art. "Canada."

5 Ed. Encyc., art. "Canada."

9 Amer. Encyc., art. "Lake."

The term, therefore, "inland navigation," obviously and naturally includes lake navigation.

It is, too, clearly apparent, that the great lakes were to be included within the exception, from the fact that all rivers—as well those connecting the great lakes as others—are expressly within it, and there could be no reason why the navigation upon the St. Clair, the Detroit, and the St. Lawrence, should be governed by a different rule from that of the connecting lakes; the commerce is intimately, nay, indissolubly, connected together, carried on by the same vessels, in same voyages, subject to similar perils and similar competition.

Nor can it be said that these rivers are but straits connecting lakes, and therefore not embraced under the title "rivers." Straits only connect ocean waters.

Maunder's Scientific Treas., art. "Straits."

Webster's Dict., art. "Straits."

17 Am. Encyc., art. "Straits."

Rees's Encyc., art. "Straits."

While these connecting waters are strictly rivers, answering in every respect the description of rivers, as given by lexicographers and geographers: "A river is a large stream of water flowing in a channel on land towards the ocean, a lake, or another river."

> Webster's Dict., "River."
> Maunder's Scientific Treas., "River."
> 16 Amer. Encyc., "River."
> 15 Ed. Encyc., "Phys. Geo.," 599.
> 4 Nat. Cyc., "Canada."
> The Constitution *v.* the Young America, 1 Newb. Ad., 106.

And from their discovery they have been termed rivers. That the St. Lawrence is universally styled a river we need only refer to a very few of the many authorities upon this subject. In all books of geography and travel, in all histories, it is spoken of as one of the great rivers of the world.

> 5 Ed. Encyc., art. "Canada."
> 15 Ed. Encyc., "Phys. Geo.," 602, 606.
> 16 Amer. Encyc., art. "River."
> 4 Nat. Cyc., art. "Canada."
> 10 Nat. Cyc., art. "River."
> 3 Murray's Encyc. of Geo., 342, 350, 360, 607.
> 1 Smith's Hist. of Canada, 5.
> 1 Warburton's Conquest of Canada, 58.
> Maj. Rogers's Account of N. America, 25.
> 10 U. S. Stat. at Large, Reciprocity Treaty, art. 4.

Although the name "Detroit," of itself, means "the strait," yet it is strictly a river, and is almost universally known as the Detroit river. It is so named in various acts of Congress, and in the very act admitting Michigan into the Union the "Detroit river" is described as one of its boundaries.

> 5 U. S. Stat. at Large, 49, 185.
> 3 U. S. Stat. at Large, 534.
> 10 U. S. Stat. at Large, 63.

It is so universally named in the statutes of Michigan.

> 1 Comp. Laws, 40, 41, 48.
> Laws of Mich., 1857, pp. 73, 95, 105, 209.

So in all the laws and ordinances in relation to the city of Detroit.

See Charter and Ordinances of Detroit.

So in numerous judicial opinions.

6 McLean, 153, 155, 156, 485.

1 Newberry's Admiralty, 11, 13, 16, 46, 47, 63, 89, 95, 103, 106, 537, 539, 541, 542, 544, 545, 547, 549, 550, 551, 553.

2 Doug., (Mich.,) 33, 34, 36, 258, 260.

1 Mich. R., 273, 275.

5 Mich., 371, 377, 378; 20 How., 315.

So by miscellaneous writers.

Hennepin's Travels, (1698,) 33.

Carver's Travels, 151.

3 Bancroft's Hist. U. S., 134.

2 Hildreth's Hist. U. S., 114.

Lanman's Mich., 40, 41.

1 Murray's Hist. of Canada, 24.

3 Murray's Encyc. of Geo., 566, 569.

10 Nat. Cyc., art. "River."

Colton's Gazetteer, art. "Detroit."

15 Nat. Review, 432, (1827.)

The reason why "navigable waters" is used in the act of February 26, 1845, instead of "navigable rivers," is, that these were artificial navigable waters connecting the lakes as well as rivers.

The Constitution v. Young America, 1 Newb., 106.

Nor will it do to say that navigation upon Lake Erie is not inland navigation because it is a great lake. The size cannot alter the question whether it be an inland body of water or not. No such distinction is anywhere recognised; and if any such distinction be attempted, what is the dividing line between a lake that is inland and one that is not? To which class does Lake Champlain, Lake St. Clair, or the Lake of the Woods, belong? Inland, in this connection, means remote from the sea.

Neither does the immense importance of its commerce furnish any reason why lake navigation is not included in the

term "inland navigation." The very same commerce traverses the St. Clair, the Detroit, and the St. Lawrence, while the magnitude of lake commerce is rivalled by that of the Mississippi and the Hudson, and their commerce is expressly within the exception.

Nor does the fact that the commerce of the lakes is within admiralty jurisdiction furnish any reason why it should not be included in the term "inland navigation." The commerce of all the great rivers of the continent is equally within this jurisdiction, and it is expressly within the exception, and it is inland as well as river navigation.

> The Genesee Chief v. Fitzhugh, 12 How., 234.
> Fritz v. Bull, 12 How., 466.
> Jackson v. Magnolia, 20 How., 291.
> Prop. F. W. Backus, 1 Newb., 1.
> Barque Jenny Lind, 1 Newb., 447.

The lakes and rivers and the commerce and navigation of the lakes and rivers of the West are usually mentioned together, and it is hardly conceivable that different rules should be applied to each.

> Woodbury, J., Clash v. Warner, 5 How., 495.
> Taney, Ch. J., Genesee Chief Case, 12 How., 47, 451.
> Grier, J., Magnolia Case, 20 How., 302.
> McLean, J., Magnolia Case, 20 How., 303.
> Daniel, J., Magnolia Case, 20 How., 315.
> Campbell, J., Magnolia Case, 20 How., 333.

The fact that Lake Erie is a border lake, and that through it runs the national boundary line, furnishes no reason why its navigation is not inland. The term "inland" can have no such meaning as "interior," within the country, within the national boundary line. This rule would bring within the exception Lakes Michigan and Champlain, and exclude from it lakes no larger, Erie and St. Clair. Rivers, too, form boundary lines; and upon any such construction, are they within or without the exception? What rule is to govern the commerce upon the St. John's, the St. Croix, the St. Lawrence, the Niagara, the St. Clair, the Detroit, the St. Mary's, the Pigeon, and the Colorado? Is it inland navigation or not? And suppose a

loss should occur upon inland waters entirely within the borders of a foreign country, as upon Georgian bay and Lake Nipising, the vessel being American, the parties American, and the suit being brought in an American court, would the case be within the exception or without it?

We submit, then, that the locality of the water, whether within or without our territorial limits, does not determine the character of the navigation, whether inland or not; that it cannot be that Lake Champlain is "inland" and Sorrel river "outland," Lake Michigan inland and Lake St. Clair not, the Mississippi inland and Pigeon river not.

It has been suggested that these great lakes are no more "inland" than the close and narrow seas, like the Baltic and the Mediterranean, and that the navigation of those seas is never termed "inland navigation."

But the analogy does not hold. The very term "inland" implies remote from the sea or tide water, and while the lakes are great like close seas, they are still remote from tide water, and therefore inland; while the seas are a part of the great ocean, on its level or nearly so, swept by its tides, governed by its laws, and like the ocean itself, not subject to dominion, but a free pathway for all nations.

Wheaton's International Law, 150, 158.

Vattel's Law of Nations, 187, 194.

Campbell, J., Jackson v. Magnolia, 20 How., 340.

Not so the lakes; they cannot be approached from the sea save by artificial means: they are not an open highway to all nations, but are within the exclusive sovereignty of the riparian nations, and it is only by treaty that they are free on either side of the boundary line to the two great nations that border on them and exercise their sovereignty over them.

It has also been suggested, that the reason why river and inland navigation was excepted from the operation of the act of 1851 was, that there was serious doubt as to the jurisdiction of Congress over such navigation, while ir relation to the navigation upon the great lakes no such doubt existed.

But it is well settled that Congress has the same jurisdiction over navigation upon rivers that it has over that upon the

lakes, and that it has no jurisdiction over either except as it extends between States or with foreign nations.

Fritz *v.* Bull, 12 How., 466.

Jackson *v.* Magnolia, 20 How., 296.

Allen *v.* Newbury, 21 How., 244.

McGuire *v.* Card, 21 How., 248.

There are few authorities bearing directly upon the question involved. Judge Conklin, in the last edition of his Admiralty, suggests, indeed, that if the language of the act be not "too unequivocal and definite to admit of the exercise of judicial discretion, that its determination may depend upon the motives to which the exception shall be ascribed;" and, starting from an entirely erroneous view of those motives, comes to the conclusion that it is possible to give to the act the construction contended for by the defendant in error.

1 Conk. Admiralty, 209.

Parsons simply announces the decision of the court below in this case without note or comment.

1 Parsons's Shipping, 401.

The Supreme Court of the Western District of New York, at the February term, 1858, in the case of Root et al. *v.* Hart et al., decided that lake navigation was included within the exception by the phrase "inland navigation."

The Supreme Court of the city of Buffalo made the same decision, after fully considering the opinion of the court below in this case.

Bresler *v.* M. S. & N. I. R. R. Co., Dec. Term, 1858.

These, with the decision of the Supreme Court of Michigan in the case at bar, are the only decisions bearing upon the construction of this statute. Judge Clifford, in the case of the propeller Niagara *v.* Cordes, suggests that the question may arise whether the lakes are not excluded from the operation of the act under the term "inland navigation," but no opinion is intimated.

20 How., 26.

The language of this exception is very nearly copied from an exception in the act 52 Geo. III, which is as follows: "That nothing therein contained shall extend to the owner of any

lighter, barge, boat, or vessel of any description whatsoever, used solely in rivers or inland navigation, or any ship or vessel not duly registered according to law."

But we look in vain for any decisions in the English courts that throw any light upon the question now before this court.

Inland navigation in England is carried on mostly, if not entirely, by canal boats, barges, and lighters, in streams strictly land guarded, or in canals. They have no great rivers and no navigable lakes, and there can be no analogy between the inland navigation in the two countries.

An attempt to apply the term "inland navigation," as it exists in England, to this country, would be as difficult and as impracticable as to apply here the English definition of navigable waters.

Bowman *v.* Wathen, 2 McLean, 382.

Angel on Watercourses, secs. 545, 550.

Or as unreasonable as to adopt the English definition of admiralty jurisdiction, limiting it to the high seas outside of the limits of any county. This rule was never adopted in this country.

The Jefferson, 10 Wheat., 428.

Peyroux *v.* Howard, 7 Pet., 342.

U. S. *v.* Coombs, 12 Pet., 72.

And yet the Supreme Court of the State of Michigan seemed to have adopted this local definition of "inland navigation," as applicable to this country.

The same court referred to several English decisions to show that when a specific class of vessels were named in a statute, followed by general words, that the latter were to be construed to apply only to vessels of the same class of build or business, and the inference that they suggest rather than state is, the words "vessels of any description whatsoever" are controlled by the vessel previously described, and must be held to apply only to vessels like barges, canal boats, and lighters, and used in the same way.

5 Mich., 384.

We submit that there is no such arbitrary rule of construction, and that whether the general words are to be thus con-

trolled and construed is a question of intent, to be drawn from the whole act.

Here it is apparent that there is no such intent. Canal boats, barges, and lighters, wherever and however used, are to be excluded from the benefits of the act, and the words "any vessel," &c., are not used at all to enlarge the number and kind of vessels thus excluded. The object of the remaining part of the exception is to exclude from the benefits of the act vessels of every description, large or small, used in a certain way, viz: in rivers or inland navigation; and to give the construction contended for, would extend the benefit of the act to all large vessels, however used, and thus defeat the obvious intent of the act, of excepting from its benefits all vessels used in rivers and inland navigation.

In this respect the exception of the act of Congress requires a different construction from the exception in the stat. 53, sec. 3. There is but one class of vessels affected by this, other than unregistered ones.

But the English cases cited, so far from favoring the view suggested by the court, seem to us to have a directly contrary effect.

The case of Hunter *v.* McGowan, 1 Bligh, 180, arose under the 2d section of 26 Geo. III., c. 86, by which "any ship or vessel" shall not be made liable for losses by fire; and it was held that, from the whole structure of the act, it clearly related only to ships and vessels usually occupied in sea voyages, and that its protection did not extend to a galbert, a species of lighter. This decision was not founded on any such arbitrary rule of construction as is referred to, but was based upon the intention clearly appearing from the whole act.

Morewood *v.* Pollock, 18 E. L. and Eq., 343.

5 Mich., 384.

In the case of Blanford *v.* Morrison, 15 C. B., 724, by the same kind of reasoning, viz: the intent appearing upon the whole act, it was held that the words "any lighter, vessel, barge, or other craft," did not include a coal brig which brought coal coastwise from Newcastle, but was held to

apply merely to such vessels as were employed to unload coal from others for delivery.

5 Mich., 385.

In Regina *v.* Reed, 28 L. and Eq., 133, it was held that a monopoly of navigation given to a company of watermen, within certain limits, "by any lighter, wherry, or other craft," did not extend to a steam tug used for tugging the hull of another vessel. It was held that it was a penal act giving a monopoly, and that it was to be construed strictly, and from the nature and purposes of the act, which was to protect wherry-men and lighter-men in carrying passengers and goods, that the term "other craft" must be construed to mean craft of the same description and used for a similar purpose, and that it did not apply to the steam tug used for the purpose named.

To the same point is Reed *v.* Ingham, 26 L. and E., 164.

But in another case arising under the same act, it was held that a power authorizing the mayor and aldermen of London to make by-laws for regulating "the boats, vessels, and other craft, to be rowed or worked within the limits of the act," did extend to steamboats.

Tisdell *v.* Coomb, 7 Ad. and E., 788.

We submit that none of these cases, in the remotest degree, authorize or favor the construction, that the words "any vessel of any description" are to be limited to vessels of the same kind or business, as canal boats, barges, and lighters.

The Supreme Court of Michigan seem to suggest that the navigation upon the lakes is not to be termed inland navigation, for the reason that they are not entirely within the territory of the United States, but are border waters; and yet it is admitted that this cannot determine the character of the navigation, for Lakes Michigan and Champlain are not border lakes; and many rivers, some of which are narrow and land-guarded, are border rivers; yet this cannot prevent the navigation upon them from being inland navigation.

The same court also suggests that the navigation of the lakes is not to be deemed inland navigation because of the maritime character of its commerce. This reasoning applies

with as great force to the large rivers as it does to the lakes, and by that fact turns all its force.

It is further suggested that the navigation of the lakes is not to be deemed inland, because lake vessels also navigate the ocean. This is equally true of vessels navigating the great rivers, and the question whether such vessels are used in ocean navigation or in inland, must be determined precisely as such questions have before been determined. The question will be, what is the navigation in which they are principally used?

The coal boat D. C. Salisbury, Alcott's Adm., 74.

Buckley *v.* Brown, Bright's Digest, 305.

McCormic *v.* Ives, Abbott's Adm., 418.

N. J. Steam Nav. Co. *v.* Merchants' B'k. 6 How., 392.

Walker *v.* Cheney, 4 Am. Law Reg., 407.

But it would seem it is only by the assent of Great Britain and her courtesy that American lake vessels can pass to the ocean.

Recip. Treaty of 1854, art. 4.

We submit, in conclusion, that the ordinary meaning should be given to the word "inland" in this act, and that there is nothing in the act itself, in the history of legislation upon the subject in judicial decisions, or in the reasoning of the court below, to authorize the forced construction which was given to it by that court.

*Mr. George B. Hibbard,* for the defendant in error, made the following points:

*Point First.* The steamboat, at the time of her being burned, was not "used in inland navigation," and therefore the defendant in error, though a common carrier, was not liable for the loss of the goods.

I. The act entitled "An act to limit the liability of ship owners, and for other purposes," exempts the defendant in error from that liability.

9 Stat. at L., 635.

1. The first section of the act, in substance, provides that the owner of any ship or vessel shall not be liable for any loss to any goods on board the ship or vessel by reason or means

of any fire happening on board the ship or vessel, unless caused by the design or neglect of such owner.

2. The third section limits the liability of the owner in cases of collision, &c., &c., happening without the privity or knowledge of the owner, to the amount or value of the interest of such owner in the ship or vessel and her freight then pending.

3. The fourth section of the act provides substantially that the vessel owner, in certain cases, may exempt himself from liability, by assigning his interest in the vessel to a trustee for the benefit of the claimants against him.

4. The last clause of the seventh section reads as follows: "This act shall not apply to the owner or owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation."

II. For the purpose of arriving at the meaning of the last quoted clause of the act, it is necessary, in the first instance, to refer to former legislation on the subject in England, (the act in question being virtually a re-enactment of English statutes;) the state of the law before that legislation; the causes which led to the passage of the English acts, as well as our own, and the objects sought to be promoted by the legislation of both countries. Such aids in interpretation of the law are, beyond question, proper.

1 Kent's Com., 460.

Tonnell *v.* Hall, 4 Comstock, 140.

Aldridge *v.* Williams, 3 Howard, 1, 24.

1. The principle of the act, unqualified by the limiting clause in question, has been operative in all modern civilized nations, possessing a national commerce, whenever the policy of such nations has been finally adapted to the exigencies of that commerce.

2. By the civil law itself, the owners of vessels were liable, in matters *ex delicto*, according to the amount of their respective interests in the ship. This, however, was not the case in matters arising *ex contractu.*

2 Brown's Civ. and Ad. L., 136, 138, 141.

The Rebecca, Ware, 194, 195.

3. The principle of this rule was adopted by nearly, if not quite, all the maritime powers of Europe, (excepting England, though England soon adopted it by legislation,) with the important qualification, however, that the extent of the liability, both in matters arising *ex contractu* and *ex delicto*, should be equal only to the amount of the interest of the owner sought to be charged in the ship itself. It was the law of Holland, Hamburg, and Sweden, (and indeed of the whole north of Europe,) with the same right in the owner as that given by the fourth section of the act immediately in question, of exempting himself entirely from personal liability, by surrendering the ship to the injured parties. It was the law of France by special ordinance, which, however, was said by Cleirac to be but a recognition of a rule acknowledged as generally existing. It was the general law of the Mediterranean.

Grotius De Jure Belli et Pacis, Liv. 2, c. 11, sec. 13.
Marine Ordinance Louis XIV, title 4.
2 Peters Ad. Decis., Appendix XVI.
Cleirac, Navigation des Rivieres, art. 15, p. 502.
Consulat de la Mer, c. 34.
The Rebecca, Ware, 195, 196, 197.

4. The whole principle which led to the legislation in England, (and which legislation was the source of our own act,) was recognised in its application to ships; and that, too, without limitation as to the waters upon which the ships were navigated.

Abbott on Shipping, 395.

5. The case of Boucher *v.* Lawson was decided in 1733. It held that the ship owner was liable for coin embezzled by the master after shipment.

Boucher *v.* Lawson, Rep. Temp. Hardwicke, 85.

The merchants of London, alarmed by this decision, on petition to Parliament, procured the passage, in 1734, of the act 7 Geo II, c. 15.

Abbott on Sh., 395.

This act provided that the owner should not be liable for any such embezzlement, or for any other act of the master or

mariners, done without the privity, &c., of the owner, **beyond the value of the interest of the owner in the ship.**

6. The case of Boucher *v.* Lawson was followed by the case of Sutton *v.* Mitchell; and that by the case, decided in 1785, of Forward *v.* Pittard.

Sutton *v.* Mitchell, 1 T. R., 18.

Forward *v.* Pittard, 1 T. R., 27.

Lord Mansfield, in deciding this last case, says: "There are events for which the carrier is liable, independent of his contract." That further responsibility is "by the custom of the realm; that is, by the common law, by which a carrier is in the nature of an insurer." Upon familiar principles, he therefore decides a carrier, in a case of accidental fire, to be liable for the entire loss happening thereby to the owner of the goods in process of carriage.

This was the undoubted common-law rule at the time; and under the custom of the realm, the law of England being established to be thus different from that of continental Europe, these decisions were followed (in the enlightened policy of promoting so much of commerce as was really national) by the act of 26 Geo. III, c. 86, in 1786; and this by 53 Geo. III, c. 159, in 1813.

The object of all these acts is stated in some of the acts themselves. It was stated in the preamble to the act of 7 Geo. III, that "it was of the greatest consequence and importance to the kingdom to promote the increase of the number of ships and vessels, and to prevent any discouragement to merchants and others from being interested and concerned therein." The courts have recognised the whole objects of this legislation to be, "to encourage persons to become the owners of ships."

Gale *v.* Laurie, 5 B. and C., 156.

7. The acts of Geo. III are the sources, and almost the exact originals, of the act of Congress of 1851. The main provisions of the English acts are almost in language, and altogether in principle and object, identical with the act of 1851. The last clause of the act of 53 Geo. III is almost precisely like the portion of the act of Congress more particularly

under consideration. The English statute provides that it shall not extend to "the owners of any lighter, barge, boat, or vessel of any burden or description whatsoever, used wholly in rivers or inland navigation, or vessel not duly registered according to law."

8. The common-law rule, unqualified by legislation, became the law of this country. The case of the Lexington was decided in 1848.

The N. J. S. M. Co. *v.* The Merchants' Bank, 6 How., 344. It was followed by the act of 1851.

9. The causes which led to the passage of the act of 1851 were, therefore, precisely similar to those which led to the English legislation. The acts of both countries are essentially the same. The commercial policy of both countries, and the objects to be subserved by the legislation of each, in this particular, are alike. Beyond all question, therefore, (and particularly under the rules of statutory construction referred to, Point First, II,) each of these acts must illustrate the other. The objects of all must aid in the interpretation of each. The authorities of either country bearing directly upon either of the acts, or upon kindred legislation, must aid in the construction sought for.

III. Approaching the immediate question under Point First, after brief review of the causes and objects of the law in question, the defendant in error claims, directly, that the navigation of Lake Erie and the great Western lakes is not "inland."

1. The meaning of the words "inland navigation," as thus employed, does not include the navigation of such waters.

2. The question is not what is the geographical meaning of the word "inland," used in distinguishing seas from oceans, or the waters within the body of a continent from the high seas. The question is as to the meaning of the phrase "inland navigation," employed in reference to a commercial business, and to promoting commercial objects. In this view, the meaning of the same words, or equivalent phrases in the same connection, are the true governing authorities, so far as mere definition is concerned.

3. The exact definition of the word "inland," as well as the

phrase "inland navigation," shows that such navigation is not the navigation of the great Western lakes. Webster's definition, (Webster's Dict., "Inland,") as applied to navigation, is: "Carried on within a country; domestic, not foreign, as inland trade or transportation; inland navigation." Worcester defines the word thus employed (Worcester's Dict., "Inland,") as: "Pertaining to the interior of a country; internal; opposed to coasting; inland navigation." In Rees's Encyclopedia, (Rees's Encyclopedia, "Inland Navigation,") "inland navigation" is defined to be a term "applied to the passage of boats and vessels on canals and rivers within a country, to distinguish it from navigation, properly so called, by means of shipping on the open seas, or on the largest of the lakes." The definition of the Encyclopedia Britannica (Encyc. Brit., "Navigation, Inland") is as follows: "Inland navigation may be defined as that branch of navigation which extends from the sea to the land, and affords the means of transportation through the interior of a country.

The word "inland," thus used, is opposed in meaning to the word "foreign." "Foreign" (Burrill's Law Dict., "Foreign") means "that which is without or beyond the limits of a particular territory," as the Western lakes are beyond the limits of a particular State. The navigation of the lakes is not "inland," as a bill of exchange drawn by a citizen of one State upon a citizen of another State is not an inland bill, and was formerly called an "outland bill," "to distinguish it," as says Justice Story, (Story on Bills, secs. 22, 23,) "from an inland bill, which is governed throughout by one municipal jurisprudence." Such navigation, thus conducted, through the systems of jurisprudence of several States, (when Congress, beneath its power, hereinafter considered, is silent on the subject,) is foreign, in the sense that the ships employed in that navigation are foreign to the State in which they are not owned.

Conklin's Admiralty, 57.

The consideration of some decisions may further illustrate this view. The statute of limitations of the State of Georgia provided that, in certain cases, it should not apply to parties

"beyond seas." It was held that the phrase meant beyond the limits of the State, irrespective of the question whether or not the party was in fact beyond any sea or other water.

Murray *v.* Baker, 3 Wheaton, 341.

Shelby *v.* Guy, 11 Wheaton, 361.

Beyond the jurisdiction of the State of Georgia, the party was "beyond seas"—beyond the control of the jurisprudence of that State, and necessarily, therefore, not "inland."

Upon the actual meaning, therefore, of the word "inland," so used, it must be determined that the words "inland navigation," in the statute, signify only a navigation carried on within the body of the country; and doubtless, (particularly when considered, as the question must be, and is hereinafter, under the powers of Congress over commerce,) when applied to lake navigation; a navigation conducted beneath the jurisprudence of a single State. It means a navigation which, when carried on on the lakes, is not the coasting trade.

4. The navigation, to be "inland," must be upon waters themselves "inland." The great Western lakes are not such inland waters.

This is a question of commerce and of law, not of geography. Other waters exist upon the face of the globe, the precise parallel of the Western lakes in commercial and legal view, which certainly are not "inland." Therefore the Western lakes are not "inland."

The case of the Genesee Chief, (Fitzhugh *v.* the Genesee Chief, 12 How., 443,) which will be hereafter adverted to in a more important view, established the principle that the business of the Western lakes and their national position determined their commercial and legal character, and that the distinctions, convenient in England, of the rise and fall of the tide and the saltness of the water, had nothing to do with thus fixing that character. Excluding, therefore, once for all, these immaterial tests, the great Western lakes, when viewed in comparison with other waters, not only are not "inland," but are commercial and legal seas.

And, first, as to their not being inland, regarded in the suggested comparison.

The Baltic sea, with the Gulfs of Finland and Bothnia, form one chain of waters; the Mediterranean, the Adriatic, the sea of Marmora, and the Black sea, another, like the line of the great Western lakes. The Mediterranean long has been known as the "tideless sea," and was, beside, the "*mare internum*" of the Romans.

> Edinburgh Review, Oct., 1857, "The Mediterranean."
> Encyclopedia Britannica, "The Mediterranean."

The inlets to both these chains of waters are narrow. In other physical features they are like them. In commercial character they are identical with them. Classed by the geographers, in the loose language which so generalizes such waters, as easily to distinguish them from the great oceans, they are sometimes termed, (as the Western lakes themselves were termed by Chief Justice Taney, in the Genesee Chief case,) "inland seas." Yet would the navigation of these European waters, or of Hudson's Bay, or Long Island Sound, or of the Gulf of Mexico, be termed "inland," in the view in which they must be regarded in this case? To the communities which dwelt along the borders of the European seas, and maintained a commerce petty in comparison with that now upon the Western lakes, we owe the very foundations of that body of admiralty law, never devised or efficient with reference to an inland commerce. From such communities sprang the Rhodian law, the Consulat de la Mer, the Tables of Amalfi, the laws of Wisbuy, of Oleron, and the Hanse towns. There lived those early writers upon maritime law, to whom we now look for the practical exposition of questions arising with respect to a commerce upon our lakes, far more like their own than that carried on upon the high seas. Waters thus situated, over which was extended that body of admiralty law which never was applicable to an "inland" trade, certainly never were "inland."

> The Twee Gebroeders, 3 C. Robinson, 336.

Our waters, their very parallel, in every physical, commercial, and legal feature, and over which the same body of laws (as was decided in the Genesee Chief case, from the very character of the waters) extends to day, equally are not "inland."

But, as has been said, these waters are commercial and legal seas, and therefore their navigation cannot be "inland." They are *extra fauces terræ.*

The Schooner Harriet, 1 Story R., 251, 259.

They are waters where, to adopt the language of Sir Matthew Hale, "a man may not discern from shore to shore."

De Port. Maris. Harg. Tracts, c. 4, p. 10.

Hawkins Pl. C., b. 2, c. 9, sec. 14.

U. S. *v.* Grush, 5 Mason, 290, 298.

They are not within the boundary of any county; and, within the definition of Lord Coke himself, are therefore not inland.

4 Inst., 140, c. 22.

2 East. P. C., c. 17, sec. 10.

Comyn's Dig. Admiralty E., 7.

De Loviot *v.* Boit, 2 Gallison, 398, 426, 427.

Waring *v.* Clark, 5 How., 441, 462.

They are bordered not only by the States constituting the United States, but by the province of a foreign nation. Their navigation is subject to all the hazards that attend that of the ocean. "Hostile fleets," to use the language of Chief Justice Taney in the Genesee Chief case, "have encountered upon them, and prizes have been made there." The same system of admiralty law applies to them as to the commerce of the remoter oceans. That commerce, as will hereafter be seen, is equally extensive with that of our foreign commerce itself.

It is repeated, there is not a characteristic (excluding the immaterial ones of the ebb and flow of the tide and the saltness of the water, excluded by the Genesee Chief case, and which in this view always would have been excluded—2 Peters's Ad. Decis., LXXI; Spelman Reliq. Adm. Juris., 226; 2 Hale. P. C., 16) belonging to the "high seas"—the "main sea" of Coke and Hale, and Selden and Blackstone, which does not belong to the Western lakes. How, then, can their navigation be termed inland? Would the navigation of such waters be termed inland, within the meaning of the statutes of Geo. II and Geo. III? Would the navigation of the waters of the "four seas," (Hargrave and Butler's Notes to Coke upon

Litt., L. 2, c. 8, sec. 157; Chitty on Commercial Law, 88—102) including St. George's channel or the Irish sea, be deemed "inland" by an English court, construing the language in question as used in the statutes of Geo. III?

5. Some minor considerations will show, in this connection, that such navigation cannot be called inland.

By the law of nations, exclusive national jurisdiction, for certain purposes, is established over at least a marine league from the coast.

1 Kent's Com., 27, 28.

The whole of Delaware bay has been determined to be within national jurisdiction.

Opinion of Edmund Randolph, Attorney General U. S , 1 Opinion Att. Gen., 13.

The navigation of none of these waters would be termed "inland;" yet it should be, if the Western lakes are "inland."

6. Regarding the language in question, then, beneath all the lights which can be thrown upon it, it must be determined that the navigation in question is not "inland." This, a single question, intelligently put and answered—put and answered with full comprehension of the meaning of all things relating to this commercial and legal subject—must determine "inland." Within what land do these waters lie? That question would hardly be put upon some of the ships and steamboats upon the Western lakes, with nothing in sight above the horizon, nor within many leagues, unless it might be other ships employed in commerce between different States and Provinces, and (through the Welland Canal, which, overcoming the natural obstacle of Niagara Falls, has thus given access to the high seas through those public means, which Sir Matthew Hale says—De Port. Maris, c. 3.—render waters thus opened to public trade, public waters,) with European kingdoms.

IV. The object of the law determines the fact that the navigation of the lakes is not "inland," within the meaning of the act.

1. In ascertaining the object of the law, the court cannot, in the language of Chief Justice Taney, in any degree, be influenced by the construction placed upon it by individual

members of Congress in the debates which took place on its passage. "We must gather the intention of Congress from the language used in the law, comparing it, where ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed."

 Aldridge *v.* Williams, 3 Howard, 1, 24.

 Bank of Penn. *v.* the Commonwealth, 7 (Harris) Penn. R., 144.

 Southwark Bank *v.* the Commonwealth, 26 Penn. State R., 240.

2. In determining whether the objects of the law would necessarily make it apply to the navigation of the Western lakes, it is, of course, necessary to ascertain something of the extent of these waters, and of the commerce carried on upon them.

The area of the lakes is some 90,000 square miles, and the aggregate length of the lakes alone exceeds 1,500 miles.

 Andrews's Rep. on Colonial and Lake Trade, communicated to the Senate Aug. 26, 1852.

The value of the property annually carried in the transactions of the lake commerce exceeds $600,000,000, (exceeding the total value of property exported and imported into the United States in its foreign trade.) It is conducted in more than 1,600 vessels, with an aggregate burden exceeding 400,000 tons.

 Report of Com. on Commerce to H. of R., 1856, vol. 3, No. 316, pp. 9, 10, 11.

 Report Hon. I. T. Hatch, Commissioner, &c., to H. of R., June 18, 1860.

The strictly foreign trade with Canada alone on the lakes exceeds $30,000,000 in amount, annually, making our strictly foreign commerce with Canada third in actual value, and first in the amount of tonnage employed, compared with our commerce with all the foreign countries with which we have any trade.

 Report of Com. on Commerce, 1856, pp. 10, 12.

3. Considering, therefore, the undoubted objects of the act,

(Point First, II, 6,) the immediate cause which led to the passage of the act, the loss of the Lexington, running in the coasting trade, like the vessels on the Western lakes, (Point First, II, 8,) the extent of the waters on which this commerce is conducted, the extent and national importance of that commerce itself, it certainly must be apparent that the promotion of such a commerce must have been within the objects of the act.

V. Our whole system of statutory law in reference to the coasting trade establishes the fact that such a trade has never been regarded as "inland" in its character.

1. The whole system of these provisions is thus generally regarded.

2 Kent's Com., 599, 600.

Elliott *v.* Rossel, 10 J. R., 10, 11.

2. The whole spirit of express legislation on these subjects shows such to be the fact.

- The ordinance of 1787 dedicates these waters as public highways to the commerce of the States, and says they "shall be common highways, and forever free, as well to the inhabitants of the Territory as to the citizens of the United States, and those of any other States which may be admitted into the Confederacy."

Ordinance 1787, 1 Stat. at L., 52, note.

The act of 1793 in respect to the enrollment of vessels, (1 Stat. at L., 307;) the act of 1831, conferring enlarged privileges upon enrolled vessels on the Northwestern frontier, (4 Stat. at L., 487;) the steamboat inspection acts of 1838 (5 Stat. at L., 305) and of 1852, (10 Stat. at L., 62;) the act of 1850, requiring transfers of vessels to be recorded, (9 Stat. at L., 440;) the act of 1845, giving the District Courts jurisdiction of admiralty cases, (5 Stat. at L., 726)—all evidently regard the coasting trade of the lakes as the same in character with that of the seaboard.

This act has been expressly held to apply to vessels employed in the coasting trade on the seaboard.

Watson *v.* Marks, 2d vol. Law Reg., 157, U. S District Court, E. Dist. Pennsylvania.

Can any reason be discovered why it should not as well apply to a vessel enrolled and licensed under the same laws, and employed in the same trade, upon another "coast" (Champlain and W. L. R. R. Co. *v.* Valentine, 19 Barbour, 484) of the country?

When this act of 1851 was passed, all these laws—the law of 1845, conferring jurisdiction in admiralty cases on the lakes to the District Courts, as well as the others—were in force. Can it be supposed, that if it was the intent of Congress to exclude the commerce of the lakes from the operation of such a law, that intent, under all the circumstances, would not have been plainly expressed?

VI. Admiralty jurisdiction, it was held in the Genesee Chief case, extends over the Western lakes. They cannot, therefore, be "inland."

1. In the Genesee Chief case, the court held (in accordance with that opinion of Chief Justice Marshall, which he said was one of the most deliberate of his life—Van Santvoord's Lives of the Chief Justices, 444,) that admiralty jurisdiction extended over the great Western lakes, within the meaning of the phrase "admiralty and maritime jurisdiction" in the Constitution, (art. 3, sec. 2,) from the commercial and national character of those waters, and the character of the trade conducted upon them.

Fitzhugh *v.* the Genesee Chief, 12 Howard, 443.

The Chas. Mears, 1 Newberry, 197.

Woolrych's Law of Waters, (Law Library,) 62.

2. Admiralty jurisdiction was never held, and, regarding the remedies administered under it, never could have been held, to extend over "inland navigation."

1 Curtis's Juris. Courts U. S., 34, 48.

De Loviot *v.* Boit, 2 Gallison, 398, 436, 468, and authorities cited.

This may especially be said, under the recent decisions, that admiralty jurisdiction does not include matters relating to transactions taking place within the limits of a single State.

Allen *v.* Newbury, 21 How., 244.

Maguire *v.* Card, 21 How., 248.

3. It therefore may be claimed that the phrase "inland navigation" was advisedly, or at least fortunately, used in the act. Its use enables the act to be applied wherever it in principle should apply; that is, wherever admiralty jurisdiction extends.

How, it may be asked, would a decision of this court, that this act does not apply to the lakes, stand on principle, in comparison with the decision in the case of the Genesee Chief?

VII. Congress intended, by the phrase "inland navigation," simply to exclude from the operation of the act only such places as it could not, under the Constitution, exercise such power over.

1. Congress has no power, under the Constitution, to legislate as to the commerce carried on within the bounds of any one State.

Gibbons *v.* Ogden, 9 Wheaton, 1, 195.
Steamboat Co. *v.* Livingston, 3 Cowen, 713, 755.

The object of the concluding paragraph of sec. 7 of the act, therefore, doubtless is expressly to provide that the act shall not apply where Congress has no power to make it apply. Similar restrictive phrases are commonly used in statutes, *ex abundanti cautela.*

2. Congress has the constitutional power to exercise legislation over the Western lakes.

Fitzhugh *v.* the Genesee Chief, 12 How., 443.
See Point Third.

Therefore, as the act applies in all cases except where its own limitations provide it shall not apply, it must apply to those waters.

3. Had it been the intent of the act that it should not apply to any of the lakes, the words "rivers and lakes" would have been used. As it is, it uses the term "inland navigation," and so uses it in the meaning given it by the courts—the navigation of waters within the bounds of a single State over which Congress has no control.

Steamboat Co. *v.* Livingston, 3 Cow., 755.
Gibbons *v.* Ogden, 9 Wheaton, 194.

The steamboat James Morrison, 1 Newberry's Admiralty R., 241, 246.

4. Must this not be clearly so, when the act is considered under the rule that statutes which favor commerce are to be liberally construed, and those parts which restrict it must be strictly construed?

Sewell *v.* Jones, 9 Pick., 412, 414.

Must it not be clearly so, under the rule, that excepting clauses in a statute are always strictly construed? "For it is a maxim," says Justice Story, "in the interpretation of statutes, that when the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall plainly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exceptions, must establish it as being within the words as well as the reasons thereof."

The U. S. *v.* Dickson, 15 Peters, 141, 165.

[The remaining points of *Mr. Hibbard's* argument are omitted, for want of room.]

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Michigan.

The suit was brought by the plaintiffs in the court below against the defendants, a company incorporated under the laws of New York, and owners of the steam propeller M. B. Spaulding.

The goods in question were put on board of the propeller at Buffalo, on the 30th October, 1856, for transportation to Detroit, and on the next day they took fire, and vessel and goods were entirely consumed, without any default or negligence of the master or crew, or any knowledge of the defendants, their officers or agents. The propeller was of more than twenty tons burden, and was enrolled and licensed for the coasting trade, and engaged in navigation and commerce, as a

*Moore et al.* v. *American Transportation Co.*

common carrier, between ports and places in different States upon the lakes, and navigable waters connecting the same.

The defendants relied, in their defence, upon the act of Congress, passed March 3d, 1851, entitled "an act to limit the liability of ship owners, and for other purposes."

The 1st section provides that no owner of any ship or vessel shall be liable to answer for any loss or damage which may happen to any goods or merchandise which shall be shipped on board any such ship or vessel, by reason of any fire happening on board the same, unless such fire is caused by design or neglect of such owner, with a proviso that the parties may make such contract between themselves on the subject as they please.

The 2d section provides against any liability of the owner of the vessel, in case of precious metals, &c., unless notice and entry on the bill of landing.

The 3d section provides against liability of the owner, in cases of embezzlement or loss, &c., by the master, officers, &c., of any property shipped on board, or for any loss by collision, &c., without the privity or knowledge of the owner, exceeding the value of his interest in the ship and freight.

The 4th section provides for an apportionment of the proceeds, in case of the sale of the vessel, among the several freighters or owners of the goods, if these and the freight should not be sufficient to pay each loss.

The 6th section saves the remedy against the master and hands, in case of embezzlement or loss, or for any negligence or malversation by these persons.

The 7th section, after providing a penalty for shipping oil of vitriol, and such dangerous materials, without notice to the master, is as follows: "This act shall not apply to the owner or owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation."

It is insisted, on the part of the plaintiffs, that the navigation of Lake Erie, and also of all the other lakes in connection therewith, is within the exception to this act, as falling within the words "inland navigation." The question thus raised is

not without difficulty, as we have no clear or certain guide to lead us to the true meaning attached to these words by Congress. Looking at them in a very general sense, and without much regard to the reasons or policy of the law, it may, with some plausibility, be urged, as has been on behalf of the plaintiffs, that the phrase "inland navigation" was used as contradistinguished from navigation upon the ocean; and that all vessels navigating waters within headlands, and after they have passed out of the ocean, come within the designation. But a construction thus broad can hardly be maintained, for it would be unreasonable to suppose that Congress intended to apply one rule of responsibility to the owner in respect to the same vessel upon the ocean, and another upon the bays or rivers, in the course of the same voyage. Besides the absence of any good reason for such a distinction as to the rule of responsibility, it would have seriously embarrassed all parties engaged in commerce of this description in respect to their securities against accidents, and losses by means of insurance, bills of lading, charter-parties, &c.

The connection in which this term "inland navigation" is used in the act, we think, may throw some light upon the intent of the law-makers.

It is declared, that the act shall not apply to the owner of any *canal-boat, barge,* or *lighter,* or to any vessel of any description used in rivers or inland navigation. It will be seen, that certain craft is excepted from the act *eo nomine,* and then a class of vessels without any designation, other than by a reference to the waters or locality in which used. But the character of the craft enumerated may well serve to indicate to some extent, and with some reason, the class of vessels in the mind of the law-makers, which are designated by the place where employed. This class may well be regarded *ejusdem generis,* and thus aid us in interpreting the true meaning of the words of the act, namely, vessels "used in rivers or inland navigation."

Many of the provisions of this act were taken from the 53 Geo. 3, c. 159, as also the exception to the enacting clause. The exception in the English act is as follows: that nothing

in this act shall extend to the owner of any "lighter, barge, boat, or vessel of any description whatsoever, used solely in rivers or inland navigation."

The language of this exception is more specific than that used in ours; but the meaning intended to be conveyed, we think substantially the same. The words in ours are, "any vessel of any description whatsoever, USED in rivers or inland navigation." This word *used* means, in the connection found, *employed,* and doubtless, in the mind of Congress, was intended to refer to vessels solely employed in rivers or inland navigation. It was this species of navigation—that is, on rivers and inland—which was intended to be withdrawn from the limitation of the liability of the owner; and the addition of the term "inland navigation," as an alternative to rivers, was doubtless designed, speaking in a general sense, to embrace all internal waters, either connected with rivers, but which did not, in a geographical or popular sense, fall under that name, or which might not be connected with rivers, but fell within the reason or policy of the exception, such as bays, inlets, straits, &c. Vessels, whatever may be their class or description, solely employed upon these waters, are usually employed in the trade and traffic of the localities, carried on chiefly by persons residing upon their borders, and connected with the local business, and without the formalities and precautions observed in regular commercial pursuits, with a view to guard against accidents and losses, such as insurance, bills of lading, &c. It was fit and proper, therefore, in this description of trade and traffic, that the common-law liabilities of the carrier should remain unaltered.

But the business upon the great lakes lying upon our Northern frontiers, carried on between the States, and with the foreign nation with which they are connected, (and this is the only business which Congress can regulate, or with which we are dealing,) is of a very different character. They form a boundary between this foreign country and the United States for a distance of some twelve hundred miles, and are of an average width of at least one hundred miles; and this, without including Lake Michigan, of itself three hundred and fifty

miles in length, and ninety in breadth, which lies wholly within the United States. The aggregate length of these lakes is over fifteen hundred miles, and the area covered by their waters is said to be some ninety thousand square miles. The commerce upon them corresponds with their magnitude.

According to the best official statistics, the value of the property annually, the subject of this commerce, exceeds $600,000,000, employing more than sixteen hundred vessels, with an aggregate tonnage exceeding four hundred thousand tons. These vessels are duly licensed for the foreign trade, as well as for that carried on coastwise. This commerce, from its magnitude, and the well-known perils incident to the lake navigation, deserves to be placed on the footing of commerce on the ocean; and, we think, in view of it, Congress could not have classed it with the business upon rivers, or inland navigation, in the sense in which we understand these terms.

These lakes are usually designated by public men and jurists, when speaking of them, as great inland waters, inland seas, or great lakes; and, if Congress intended to have excluded them from the limitation of the liabilities of owners, it would have been most natural and reasonable, and, indeed, almost a matter of course, to have referred to them by a more specific designation.

The decision in the case of the Lexington, which was burned upon Long Island Sound, led to this act of 1851. That case was decided in 1848, subjecting the carrier in case of a loss by fire. (6 How., 344.)

The Sound is but one hundred and ten miles in length, and from two to twenty in breadth.

The waters of these lakes, in the aggregate, exceed those of the Baltic, the Caspian, or the Black sea, and approach in magnitude those of the Mediterranean. They exceed those of the Red sea, the North sea or German ocean, the sea of Marmora, and of Azoff. And, like the lakes, all of these seas, with the exception of the North sea, are tideless. The marine disasters upon these lakes, in consequence of the few natural harbors for the shelter of vessels, and the consequent losses of life and property, are immense. According to the

report of a committee in the House of Representatives in 1856, the destruction of property upon Lake Michigan in the year 1855 exceeded $1,000,000. The appalling destruction of life in the loss of the Erie upon Lake Erie, and of the Superior and Lady Elgin upon Michigan, are still fresh in the recollections of the country. The policy and justice of the limitation of the liability of the owners, under this act of 1851, are as applicable to this navigation as to that of the ocean. The act was designed to promote the building of ships, and to encourage persons engaged in the business of navigation, and to place that of this country upon a footing with England and on the continent of Europe. The act not only exempts the owner from the casualty of fire, but limits his liability in cases of embezzlement or loss of goods on board by the master, officers, &c., and also for loss or damage from collisions, and, indeed, for any loss or damage occurring without the privity of the owner, to an amount not exceeding the value of the vessel and freight.

It has been suggested that our construction of the act may embrace within the limitation of the liability of the owners Western lakes lying within a State, such as the Cayuga, Seneca, and the like. But the answer is, that commerce upon these lakes, and all others similarly situated, is not within the regulation of Congress. The act can apply to vessels only which are engaged in foreign commerce, and commerce between the States. The purely internal commerce and navigation of a State is exclusively under State regulation.

We think the court below was right, and that the judgment should be affirmed.

Mr. Justice CATRON dissenting.

By the common law of England ship owners were common carriers, and insurers against loss, of the goods shipped, without limitation as to the waters upon which the ships were navigated. Abbott on Shipping, 395. In the United States the same law governed. 2 Kent's Com., 599. N. J. S. Nav. Co. v. Merchants' Bank, 6 How., 334. In parts of continental Europe the law was different. The preamble of the British

act of 7 Geo. 3d, declares, "that it was of the greatest conse-
quence and importance. to the kingdom to promote and in-
crease the number of ships and vessels, and to prevent any
discouragement to merchants, and others, from being inter-
ested and concerned therein." The object of the British legis-
lation was "to encourage persons to become owners of ships."
By the act of Geo. 2d, and others, the Parliament exempted
ship owners from liability in several cases of loss, and among
them, loss by fire. That these laws applied to commerce on
the ocean, is not controverted. Nor are they in force on the
great lakes, partly belonging to Great Britain, on this conti-
nent.

Our act of Congress of March 3, 1851, was passed to put
our commercial marine on an equal footing with that of Great
Britain; so that the increase of the number of ships, and the
navigation of them, might be equally encouraged. That *com-
petition* with British shipping was the object of Congress, is
manifest to my mind from the fact that the provisions of our
statute correspond to British statutes. As there was no
competition on our lakes, great or small, there was no reason
for exempting owners of vessels from liability; and especially,
for the reason that a vessel navigating a lake from one port
to another, in the same State, is not within the act; as Con-
gress could only legislate by force of the commercial power,
and regulate commerce among the States. The act of 1851
does not in terms, nor by any fair intendment, as I think,
attempt to regulate such internal commerce. Fearing, how-
ever, that it might be held to apply to actual navigation, an
exception was appended to the act, declaring that it should
not apply to owners of canal boats, nor to lighters or barges,
This description of vessels were brought into, or used, in har-
bors and bays; and these being arms of the sea might be held
as coming within the provisions of the act of Congress, the
commerce they were engaged in being connected with that
on the ocean. The commerce on the Chesapeake, through
the tide-water .canal, into the Delaware, by vessels propelled
by steam, and the commerce carried on through the Hudson,
into New York harbor, by canal boats and barges, shows the

reason why the exception was made, as respects this class of vessels.

And then comes the exception, of vessels that had no connection with commerce on the ocean, which declares, that the act shall not apply to any vessel, of any description whatsoever, used in rivers, or used in inland navigation. Why should navigation on the Mississippi and the St. Lawrence be governed by one law, and the great lakes, Green bay, Lake Champlain, Great Salt lake, Utah lake, and many others, by another rule of liability? Congress has made no such distinction; but on the contrary, every section and clause of the act of 1851 refer to losses happening on, or to vessels navigating, the ocean. The third section is especially significant of this conclusion.

What the expression, "inland navigation," means, must be ascertained from the geography of our own country, and the commerce carried on by vessels on its waters. Lake Erie is inland, and a voyage from Buffalo to Detroit is, in my judgment, "inland navigation." I am, therefore, of the opinion that the judgment should be reversed.