### The Garden City.[1]

### In re Petition of East River Ferry Co.

*(District Court, S. D. New York. February 17, 1886.)*

1. Shipping — Limitation of Liability — Valid under Power of Congress over Admiralty and Maritime Causes — Constitutional Law.
   The act of March 3, 1851, (sections 4282-4289,) in limitation of liability, so far as applicable to marine torts or to other subjects of maritime jurisdiction, is within the constitutional power of congress, independent of its relation to foreign or interstate commerce. Such power is co-extensive with the grant of the judicial power "to all cases of admiralty and maritime jurisdiction," and of all necessary legislative power in regulating the remedies under that jurisdiction; following *The Seawanhaka*, 5 Fed. Rep. 599.

2. Same — Section 4282, Rev. St. — "Merchandise" — Horses and Trucks.
   Horses and trucks, which are taken aboard a ferry-boat by their drivers, who are passengers, and remain in their charge upon the trip, are not "merchandise," within the meaning of section 4282, Rev. St.

3. Same — Section 4283 — Jurisdiction — Practice — Amount of Claims.
   In proceedings to limit ship-owners' liability, under section 4283, it is not necessary to aver in the petition, or to prove, that the claims against the vessel are in excess of her value, as a condition of the jurisdiction of this court to entertain the proceeding.

4. Same — Section 4289 — Exception — "Rivers" — "Inland Navigation" — East River — Coast Waters.
   Section 4289, Rev. St., provides that the act limiting ship-owners' liability shall not apply to vessels "used in rivers or inland navigation." *Held*, that the "East River," so called, is not a "river," but a mere gut or strait, and belongs to the "coast waters" of the country, as distinguished from "inland navigation;" and that navigation on the East river is therefore not included in the above exception.

5. Ferry-Boats — Precautions against Fire — Powers of Steam-Boat Inspectors.
   Under sections 4426 and 4470, Rev. St., the steam-boat inspectors may require ferry-boats to be provided with the same precautions against fire, so far as applicable, that are expressly provided in reference to any other steam vessels carrying passengers; and when the boat passes inspection on the basis of having a steam-pump provided in accordance with section 4471, the boat is bound to maintain it in the condition required by that section. Various sections of the Revised Statutes in regard to steam vessels considered in their application to ferry-boats.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

**6.** SAME—STATEMENT OF CASE—SECTION 4471, REV. ST.—INSUFFICIENT HOSE.
    Fire broke out in the "center-house" of the ferry-boat Garden City while
on one of her regular trips between Roosevelt street and Hunter's point, in
the East river. The hose belonging to the boat's fire-pump was coiled and
kinked, and without a nozzle attached, and before the fire was extinguished
several horses and trucks on the ferry-boat were destroyed. The evidence in-
dicated that the fire might have been checked at once if the hose had been
stretched out with the nozzle on. Section 4471 provides that "every steamer
permitted by her certificate to carry as many as 50 passengers, or upwards,
shall be provided with a steam fire-pump, * * * having at least two pipes,
* * * to which pipes there shall be attached good and suitable hose, prop-
erly provided with nozzles, and kept in good order and ready for immediate
service." *Held*, that the above provisions had been adopted, and made legally
applicable to the Garden City by act of the parties, and under the powers con-
ferred upon inspectors by sections 4426, 4470, Rev. St., and that it was not a
compliance, either with the statute, or with the demands of reasonable pru-
dence and care for the safety of the lives of passengers in the daily exigencies
of ferry-boats on the East river, not to keep the hose stretched out and free
from coils and kinks, with the nozzle on, near the overheated parts of the
boat like the center-house, where fire is most likely to occur, so as to be liter-
ally "ready for immediate service," and that the Garden City was chargeable
with negligence in this respect, for which the ferry-boat was liable.

On the thirteenth of December, 1883, while the ferry-boat Garden
City was on one of her regular trips from Roosevelt street, New York,
to Hunter's point, a trip three and one-half miles in length, a fire
was discovered in the "center-house," near the smoke stack, when
about opposite Market street. The boat was stopped as soon as pos-
sible, her engines were reversed, and in a few minutes she regained
the end of her slip at Roosevelt street. The wind was strong from
S. S. W., and the fire spread with such rapidity that several horses
and trucks, with their harness and equipments, were destroyed.
There were but few passengers on the boat, and none were seriously
injured. Shortly afterwards two of the owners of the horses and
trucks commenced suit in the supreme court of the state to recover
their damages, one for $3,400, and one for $525, on the ground of
negligence on the part of the Garden City. The Garden City was
run principally as a ferry-boat. But at Hunter's point she made
connections with the Long Island railroad system, and in the trans-
port of passengers, baggage, and express matter, in connection with
those roads to and through New York, she was, to some extent, a
link in a continuous line of interstate commerce. A petition to limit
liability was afterwards filed in this court, pursuant to the act of
March 3, 1851, (sections 4282–4289, Rev. St.,) in which the Garden
City was valued at $30,000, and a bond for that sum was executed
by the petitioners. Notice for the presentment of claims was duly
published. Although some other damages were inflicted, only the
two claims above mentioned were presented and proved; and the
case has been brought to trial upon the averments of the petition de-
nying any negligence or liability on the part of the petitioners, and
also upon the exceptions and answer on the part of the claimants
above named. The claimants deny the petitioner's allegations of
want of negligence; and, in addition, they contend that the court has

no jurisdiction of the proceeding, because the petition does not allege that the losses were in excess of the value of the boat, and also because, under the last section of the act of March 3, 1851, (sections 4282–4289, Rev. St.,) the ferry-boat in question being used solely upon the East river and, as alleged, in "inland navigation," she is excluded from the operation of the act.

Shipman, Barlow, Larocque & Choate, for petitioner.

Charles N. Judson, opposed.

BROWN, J. Without attempting to discuss minutely the several interesting and important questions presented by this case, I shall indicate, as briefly as possible, the reasons for the conclusions to which, after much consideration, I have come.

1. Although the Garden City, through her connections with the Long Island Railroad Company, had some relations in her navigation to interstate commerce, these relations were slight and comparatively unimportant. In the recent Case of Vessel Owners' Towing Co., 26 Fed. Rep. 169, 170, it was assumed that the power of congress over the subject of limitation of liability "is to be found only in the provisions of section 8, art. 1, of the constitution, which authorizes it to regulate commerce with foreign nations and among the several states; and if the vessel is not one employed in the business of interstate or foreign commerce, then she is not within the terms of the act of congress, and her owners cannot claim the benefit of this provision."

The language above quoted was doubtless used by the learned judge in reference to the special facts of that case, which did not constitute a marine tort. Thus limited, it is no doubt correct; but as a general proposition, applicable to all the cases covered by the act of March 3, 1851, the above quoted concession to those objecting to the proceedings is, I think, too broad, and without due consideration of the importance of the question, or of the express reservation of any opinion on that point by the supreme court in the case of Lord v. Steam-ship Co., 102 U. S. 541, 545. The question was carefully considered by my learned predecessor in the case of The Seawanhaka, (In re Long Island Transp. Co.,) 5 Fed. Rep. 599, 608, 618. It was there held that the power of congress to legislate upon a limitation of the liability of vessels and their owners for marine torts was within those clauses of the constitution which extend the judicial power "to all cases of admiralty and maritime jurisdiction," and which authorize congress "to make all laws necessary and proper for carrying into execution the power vested in the government of the United States, or in any department or officer thereof." See Providence, etc., Co. v. Hill Manuf'g Co., 109 U. S. 589; S. C. 3 Sup. Ct. Rep. 379, 617.

There can be no question that the act in limitation of liability, in so far as it respects a liability for marine torts, is legislation upon subjects within the admiralty and maritime jurisdiction. The ad-

miralty jurisdiction over marine torts is wholly independent of interstate commerce. As the subject-matter itself, as one of admiralty and maritime jurisdiction, is thus brought by the constitution within the federal judicial power, and as the judicial power over this subject, under the other provisions of the constitution, must be provided for, regulated, and controlled by congress, I cannot perceive any sound objections to the power of congress to regulate the remedies for marine torts, or for any other subject of acknowledged admiralty or maritime jurisdiction, by any appropriate legislation. Numerous acts have been passed by congress in providing and regulating remedies in reference to the various other subjects to which the judicial power of the United States is, in the same section of the constitution, declared to extend. Nor is it credible, either, that the legislative power of the states, prior to the adoption of the constitution, concerning the subjects of admiralty jurisdiction arising upon their own waters, and not connected with foreign or interstate commerce, is either still retained by the respective states, to the exclusion of congress, or been dropped out of the jurisdiction of both. In the *Case of Vessel Owners' Towing Co.*, above referred to, the injury was to an abutment of a bridge, which did not constitute a marine tort, and was not, therefore, within the admiralty jurisdiction. *Rock Island Bridge*, 6 Wall. 213; *City of Lincoln*, 25 Fed. Rep. 835–837. So far as applicable to cases not within the admiralty jurisdiction, the act of congress in limitation of liability could only rest upon its power over interstate or foreign commerce. The present case is one in reference to an alleged marine tort, and is as clearly within the admiralty and maritime jurisdiction. Upon principle, therefore, as well as upon the authority of the case of *The Seawanhaka*, I concur in the conclusion of CHOATE, J., on this point, and hold that the act is constitutional and valid in its application to this case, without reference to the question whether the Garden City was or was not engaged in interstate commerce. See *The Hazel Kirke*, 25 Fed. Rep. 601, 604–606; *U. S. v. Burlington, etc., Ferry Co.*, 21 Fed. Rep. 331.

2. For the petitioners it is contended that the jurisdiction of this court may be invoked to limit liability under the first section of the act of March 3, 1851, now section 4282 of the Revised Statutes; and that their remedy, under that section, is not confined to pleading the statute by way of answer in the different suits that may be brought against them at common law or in admiralty. I am not called on, however, to pass upon that question at this time, because, in my judgment, the loss in the present case does not come within the terms of section 4282. That section, as it now reads, is confined to "loss or damage which may happen to any *merchandise* whatsoever which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire," etc. The word "goods" is omitted in the revision. The horses, trucks, harness, etc., lost in this case were in charge of the drivers, who are teamsters, and who came aboard the

ferry-boat as passengers, with their teams, on their way home at noon, without any goods or other load. The act was passed with reference to commerce and mercantile dealings. The term "merchandise" is, I think, used in its mercantile sense only. Horses and trucks may, indeed, be merchandise. They are so, in a mercantile sense, when shipped or put aboard a vessel as merchandise; but when they are driven aboard in charge of their drivers, who are passengers, and remain in their charge upon the trip, they are not shipped, taken in, or put on board as "merchandise." The liability of the ferry-boat for them is not a liability as for merchandise,—that is, the liability of a common carrier; but a wholly different and much more restricted liability,—namely, that for passengers, and their baggage. *Wyckoff* v. *Queens, etc.*, 52 N. Y. 32; *White* v. *Winnisimmet*, 7 Cush. 155. The claim of the owners in this case is not a claim for the loss of·"merchandise" as such; but for loss of property in charge of the drivers. Sections 4283 and 4284 are more extended, and embrace "any property, goods, or merchandise." The petition must therefore be restricted to the other sections of the act. Since the foregoing was written I find the same result sustained by the careful opinion of the learned judge of the Eastern district of Michigan, in the case of *The Marine City*, 6 Fed. Rep. 413.

3. I am of opinion that it is not necessary to aver or to prove that the claims against the vessel are in excess of her value, as a condition of the jurisdiction of the court to entertain this proceeding. Giving to the act of 1851 the liberal construction, in furtherance of its general purpose, to which, by the rules and by the decisions of the supreme court, it is entitled, (*Providence, etc.*, v. *Hill Manuf'g Co.*, 109 U. S. 578, 588–599; S. C. 3 Sup. Ct. Rep. 379, 617,) its objects are seen to be twofold: *First*, to fix a definite limitation of liability; *second*, to provide for the payment, *pro rata*, of all claims to the extent of the value of the vessel and freight. As an incident of the first object, the supreme court has, by the fifty-sixth rule in admiralty, expressly provided that the petitioners in this proceeding may contest all liability for the alleged loss, may have that point adjudicated before this court, and, if successful in establishing that defense, may have a decree exempting them from all liability whatsoever. *Providence, etc.*, v. *Hill, etc.*, 109 U. S. 592, 595; S. C. 3 Sup. Ct. Rep. 379, 617. Section 4285, moreover, expressly declares that it shall be "a sufficient compliance on the part of the owner with the requirements of this title relating to his liability," etc., "if he shall transfer his interest in such vessel and freight, for the benefit of such claimants, to a trustee," etc., "from and after which transfer all claims and proceedings against the owner shall cease." Here is no qualification or condition that the claims shall be averred to exceed the value of the vessel. If such an averment is essential to jurisdiction, it would seem essential that it should be proved; which is certainly not the case, since the vessel may be adjudged not liable at all.

It occasionally happens that no claims whatever are proved, and sometimes a surplus has arisen, where the claims were less than the proceeds of the vessel sold; but it has never been contended that the decrees in such cases were void. *Briggs* v. *Day*, 21 Fed. Rep. 727. It is often impracticable, moreover, for the petitioners to know or to ascertain just what the amount of the losses is. It would clearly defeat the purpose of this law if all proceedings must be delayed, and no petition could be filed, until claims were actually *presented* to the owners in excess of the value of the vessel; or if the owners of the vessel must first make sure that the amount of the actual demands against them was in excess of the value of the vessel.

As stated above, one of the clear purposes of the law is to fix and declare a certain limit of liability; and, as incident to this, to determine whether the vessel is liable at all, and to determine this in a single proceeding, and not leave it to be litigated and possibly determined in contrary ways in as many different suits as there may be different demands. *Providence, etc., Co.* v. *Hill Manuf'g Co.*, 109 U. S. 593–595; S. C. 3 Sup. Ct. Rep. 379, 617; *In re Long Island Transp. Co.*, 5 Fed. Rep. 599, 612. Owners should be held entitled to commence these proceedings with reasonable promptness, in order to determine whether they are liable at all, and, if liable, then the extent of that liability, so that they may know speedily their situation as respects the future. The supreme court, in providing by rule for the determination of both these questions in this proceeding, clearly recognize, as it seems to me, the scope of this law as extending altogether beyond the mere adjustment of *pro rata* dividends in case of deficiency.

In the case of *The Benefactor*, 103 U. S. 239, 243, 244, the supreme court, in reference to this point, say:

"The fifty-sixth rule was merely intended to relieve ship-owners from the English rule of practice, which requires them, when they seek the benefit of the law of limited liability, to confess the ship to have been in fault in the collision. This was deemed to be a very onerous requirement, for in many if not in most cases it is extremely doubtful which vessel, if either, was in fault; and to require the owners of either to confess fault before allowing them to claim the benefit of the law, would go far to deprive them of its benefit altogether. Hence this court, in preparing the rules of procedure for a limitation of liability, deemed it proper to allow a party seeking such limitation to contest any liability whatever. * * * They were intended to facilitate the proceedings of the owners of vessels for claiming the limitation of liability secured by the statute without regard to the time when such proceedings might be commenced, or whether before or after the general liability should be fixed. To require such proceedings to be commenced before a trial of the cause of collision would in many cases work injustice. In addition to the reasons already adverted to, it may be added that the owners of the vessel found in fault may often not know the amount of damage and loss sustained by the other vessel and her cargo. It may greatly exceed their expectations, and, contrary to what was originally known or supposed, may turn out to be much greater than the value of their own vessel and the freight pending thereon."

Doubtless a single claim less than the value of the vessel would be insufficient to sustain the proceeding. For in that case no purpose would be subserved by the special proceeding that would not be equally available by way of defense in an ordinary suit; and it is not to be presumed that congress intended in such a case to take away trial by jury. But when the loss or accident is one that by its nature, as in this case, involves injury to many persons, and the amount that each may claim is unknown and unascertainable, and several actions at law are already commenced, the case is in my opinion within the general intent of the act and of the supreme court rules to obtain in a single proceeding a binding and final adjudication both as to the fact of any liability at all, and, if any, the extent of that liability, and a speedy distribution to those entitled to a recovery.

4. A further objection to the jurisdiction is that the Garden City is excluded from the benefits of the act by the exception contained in section 4289, which provides that the act "shall not apply to the owners of any canal-boat, barge, or lighter, or to any vessel of any description whatsoever used in rivers or inland navigation." This exception is construed as meaning "used *only* in rivers or inland navigation." *Moore* v. *American Transp. Co.*, 24 How. 1, 36. As the Garden City is not a canal-boat, barge, or lighter, the case is not within the exception, unless it falls within the further provision of the statute as a vessel "used in rivers or inland navigation." The word "river" is thus defined: "A large stream of water flowing in a channel on land towards the ocean, a lake, or another river; a stream larger than a rivulet or a brook." Webst. Dict. "A large inland stream of water flowing into the sea, a lake, or another river; a stream larger than a brook." Worces. "A stream flowing in a channel into another river, into the ocean, or into a lake or sea." Stormonth. "A large stream of water flowing through a certain portion of the earth's surface, and discharging itself into the sea, a lake, marsh, or other river." Imperial Dict.

From the language of these definitions, as well as from the universal understanding, a river means a considerable stream of water that has a *current* of its own, flowing from a *higher level*, that constitutes its *source*, to its *mouth*, where it debouches. The "East River," so called, has none of these three essential elements. It has no *source* distinguishable from its *mouth*, nor has it any *current* of its own. It is a mere strait or gut, connecting the Atlantic ocean, through Long Island sound on the east, with the Atlantic ocean, through the Upper and Lower bays of New York on the south. It is swept by the tides, and has no current except such as the tides give it. Its whole length from Throg's neck to Governor's island is about 17 miles. See Laws N. Y., Act April 17, 1857, c. 763; *Devato* v. *823 Barrels, etc.*, 20 Fed. Rep. 514, 515. At different parts it varies from a quarter of a mile to several miles in width. Having none of the essential characters of a river, it cannot be held to be within the exception of

the statute, merely because it happens to be called the "East River."

I am also of opinion that the Garden City was not employed in "inland navigation," within the meaning of this exception. The act was passed with reference to the whole country. The immediate connection of the words "inland navigation" with the word "rivers," in the statute, indicates, I think, the sense in which these words were intended; namely, navigation within the body of the country, as distinguished alike from navigation in the coast waters, or in the open ocean. It means navigation in the rivers, canals, and the minor lakes and streams, not lying upon the border of the country. The case of *Moore* v. *American Transp. Co.*, 24 How. 1, 36, 37, sustains, I think, this construction. The contention that the term "inland navigation" was used in contradistinction from "ocean navigation," merely, and embraced "all vessels navigating waters within headlands, and after they had passed the ocean," was in that case distinctly rejected, and the words "inland navigation" held to embrace "all internal waters."

Besides internal waters, that is, the waters within the body of the country, we have the external waters of the open sea, and the coast waters, which are intermediate between the two. The latter are most nearly allied to ocean navigation, because used, and necessarily used, by all ocean-bound vessels. In the recent act revising the international regulations for prevening collisions at sea,—March 3, 1885, c. 354, (23 St. at Large, 438,)—it is provided that the international regulations shall apply to navigation "upon the high seas, and in *all coast waters* of the United States," etc.; while in section 2 of the same act (page 442) the repealing clause is not to apply to the navigation of vessels within the "harbors, lakes, and *inland waters* of the United States." This act presents the contrast between the "coast waters," which are associated with the high seas and subject to the same rules of navigation as the high seas, and the "inland waters," which are excluded from these rules. "Inland navigation" in the act of 1851 refers, I think, to the same waters as the "inland waters" of the new rules. The "coast waters" manifestly embrace, not merely the waters that face the open sea, but the bays, the passages, the inlets, and the sounds formed by the islands that skirt the coast. Long Island sound is formed by the island of Long Island stretching to the south of Connecticut; the gut or passage called the "East River," is formed by the westward end of the same island. The one is no more "inland" than the other. The East river widens insensibly into the sound. No one would claim that Long Island sound belonged to the "inland waters" of the country, or that navigation there was "inland navigation." It was, indeed, the burning of the steamer Lexington upon Long Island sound on the thirteenth of January, 1840, that led to the enactment of the law of 1851. The leading case of *Norwich Co.* v. *Wright*, 13 Wall. 104, arose from a loss upon Long Island sound.

If, in the different cases that may arise, the language of the statute be departed from, and it be sought to decide, according to some supposed analogy, or some reason of the law, aside from its terms, what cases are within the exception and what without it, it will be found impossible to draw any rational or satisfactory dividing line. The gut or passage called the "East River" widens insensibly, as I have said, into Long Island sound. At every point from Hunter's point, where the Garden City stopped, to Fall river, near the eastern end of the sound, vessels make their regular trips from this port. There is no point at which any attempt to make a division or separation among these various lines, so as to hold those on one side within, and those beyond without, the statute, that would not be arbitrary, and fail of any rational or satisfactory distinction. The same must be said of the numerous steamers of various lines running down the upper and the lower bay for the carriage of goods and passengers, such as those running to various parts of Staten island, to Sandy Hook, to Perth Amboy, and other places. In these cases, as it seems to me, the only course is to adhere strictly to the language of the statute itself, and to let the dividing line, arbitrary as it is, and arbitrary as in any event it must be, remain precisely where the language of the statute has placed it. Wherever the navigation is wholly inland, or upon rivers, i. e., rivers only and strictly, the exception applies. All other cases fall within the general provisions of the statute. The cases of *The War Eagle*, 6 Biss. 364; *The Sears*, 8 Fed. Rep. 365; and *The Mamie*, 5 Fed. Rep. 813,—are all manifestly different. The Garden City, in the present case, I hold to be not within the exception.

5. The remaining questions in the case relate to the legal liability of the petitioners for the loss of the horses and trucks in question. In the case of *Wyckoff* v. *Queens, etc.*, 52 N. Y. 32, 35, the rule of law as regards the liability of ferry-boats for goods and merchandise is stated by ALLEN, J., as follows:

"A ferry-man does not undertake absolutely for the safety of goods carried with and under the control of the owner; but he does undertake for their safety as against the defects and insufficiencies of his boat and other appliances for the performance of the services, and for the neglect or want of skill of himself and his servants."

The same rule, in substance, was applied in the case of *White* v. *Winnisimmet Co.*, 7 Cush. 155, and in *Clark* v. *Union Ferry Co.*, 35 N. Y. 485.

As regards the degree of care required for the safety of passengers, the duty imposed by law upon the carrier is "to carry safely, so far as human skill and foresight can go, the persons it undertakes to carry. * * * The law raises the duty out of regard for human life, and for the purpose of securing the utmost vigilance by carriers in protecting those who have committed themselves to their hands." *Carroll* v. *Staten Island R. Co.*, 58 N. Y. 126, 133. In *Caldwell* v. *New Jersey S. B. Co.*, 47 N. Y. 282, 288, it is said to be established

"that the carrier of passengers, especially in vehicles and convey-ances propelled by steam, where the consequences of an accident from defective machinery are almost certainly fatal to human life, is bound to use every precaution which human skill, care, and foresight can provide, and to exercise similar care and foresight in ascertain-ing and adopting new improvements to secure additional protection." In *Stokes* v. *Saltonstall*, 13 Pet. 181, the supreme court say that the undertaking and liability of a carrier of passengers "go to the extent that he or his agents, where he acts by agents, shall possess compe-tent skill, and, as far as human care and foresight can go, he will transport them safely;" and this has been repeatedly affirmed. *Penn-sylvania Co.* v. *Roy*, 102 U. S. 451, 456.

As respects the origin of this fire, there is no evidence of any spe-cific acts of negligence attributable to the owners or their servants in charge of the boat. The fire broke out in the center-house near the smoke-stack. Nothing more is ascertained. There is no proof of any want of care immediately connected with the origin of the fire; and the proof shows that the construction of the center-house was in conformity with section 4470, so far as pertains to shielding the wood-work from the "boilers, chimneys, and stove-pipes."

Title 52 of the Revised Statutes contains numerous provisions for guarding against fire, applicable to "passenger steamers," and gives very broad powers to the inspectors for the purpose of carrying out those provisions. A compliance with the statutes and the require-ments of the inspectors must be deemed, at least *prima facie*, a dis-charge of the legal obligations of the owners as respects the specific subjects covered by the statute. Upon a careful consideration of sections 4463 to 4500, which compose the second chapter of title 52, I am inclined to the opinion that many of those sections are not ap-plicable to ferry-boats. By section 4464 all steamers carrying pas-sengers, "other than ferry-boats," must have a certificate stating the number of passengers they may carry. Ferry-boats are not limited. The context in some of the sections shows that, by the phrase "pas-senger steamer," ferry-boats are not intended. In other sections, as in section 4481, applicable to steam vessels generally, only ferry-boats of less than 50 tons are excepted. See original of that section in act of February 28, 1871, (16 St. at Large, 442, § 7.) Section 4471 relates only to steamers permitted by certificate to carry a defi-nite number of passengers, and is therefore not by its own terms applicable to ferry-boats. By section 4426 in the previous chapter, the hull and boilers of every ferry-boat must be inspected under the provisions of title 52; and that section further declares that "such other provisions of law, for the better security of life, as may be ap-plicable to such vessels, shall, by the regulations of the board of su-pervising inspectors, also be required to be complied with, before a certificate of inspection shall be granted." Section 4470 requires every steamer carrying freight or passengers to be provided with suit-

able pipes, etc., to extinguish fire, and that "all woodwork or ignita-ble substances about the boilers, chimneys, cook-houses, and stove-pipes exposed to ignition, shall be thoroughly shielded," etc.; and before granting a certificate of inspection "the inspector shall require all other necessary provisions to be made throughout such vessels to guard against loss or danger from fire."

The section last referred to is, I think, undoubtedly applicable to ferry-boats. By this section, and section 4426, it is evidently competent to the inspectors to require ferry-boats to be provided with the same precautions against fire, so far as applicable, that are expressly provided in reference to other steam vessels carrying passengers. It appears, however, that no general regulations covering this subject have ever been adopted by the board of inspectors; so that it is far from clear to what extent the general provisions of title 2, c. 52, are applicable to ferry-boats as strict statutory obligations. By section 4493 the master and owners of any vessel are made liable for any damage sustained by any passenger, or his baggage, from fire or other cause, "to the full amount of damage, *if it happens through any neglect or failure* to comply with the provisions of this title, or through known defects or imperfections of the steaming apparatus, or of the hull."

The Garden City was inspected from time to time, and was approved, by the inspectors. Her general structure, equipment, and provisions against fire were, for the most part at least, in conformity with the various express provisions of chapter 2. Quite a number of specific objections were taken by the claimants relating to the number of fire buckets, life preservers, etc., to which I shall make no further reference, since they are plainly in no way connected with the origin of the fire, the failure to extinguish it at once, or the loss occasioned by it.

The objection made in reference to the hose is, however, material. Section 4471 provides that "every steamer permitted by her certificate to carry as many as fifty passengers or upwards shall be provided with a good, double-acting steam fire-pump, or other equivalent apparatus for throwing water, * * * to be kept at all times in good order and ready for immediate use, having at least two pipes of suitable dimensions to convey the water to the upper decks, * * * to which pipes there shall be attached good and suitable hose, *properly provided with nozzles, and kept in good order and ready for immediate service.*" The provisions of this section, as I have said, are not, *ex vi terminorum*, applicable to ferry-boats; but they may be made legally applicable to ferry-boats under the powers conferred upon inspectors by sections 4426 and 4470. A steam-pump and the standing pipes, hose, and nozzle, such as are required by section 4471, were provided in the construction of the Garden City, and were examined and approved by the inspectors. The evidence leaves no doubt that the inspection and the permit issued by the inspectors

were based upon the presence of these specific appliances for extinguishing fire. Other appliances were dispensed with in consequence of the presence of these; and, as this was the basis of the certificate of inspection and license, the provisions of section 4471, to that extent, must be deemed adopted by both the inspectors and the owners; and this adoption, and the license based on it, imposed an obligation on the boat to keep the appliances thus adopted "at all times in good order and ready for immediate use," as that section prescribes.

Aside from this statutory provision, however, considering the structure and use of these ferry-boats, the crowds of passengers with which they are thronged during certain hours of every day, and the great loss of life that at such times would inevitably follow an outbreak of fire, if not speedily checked, the legal rule of reasonable prudence and precaution can be held no less strict than the terms of the statute itself, namely, that the appliances for extinguishing fire shall be "kept at all times ready for immediate service." Such fires usually originate in the parts of the boat already somewhat heated, and they spread with great rapidity, as was the case in this instance. Unless they are checked within two or three minutes from the time they are discovered, there is little hope of avoiding fatal injuries; and if the appliances for extinguishing fire are not strictly kept "ready for immediate service," they might almost as well be dispensed with altogether. Reason and humanity both demand that readiness for "immediate service" be maintained in its strictest sense so far as is reasonably possible. In the case of *Pennsylvania Co.* v. *Roy*, above referred to, (102 U. S. 456,) the supreme court say that the carrier "is responsible for injuries received by passengers in the course of their transportation, which might have been avoided or guarded against by the exercise, upon his part, of extraordinary vigilance, aided by the highest skill. And this caution and vigilance must necessarily be extended to all the agencies or means employed by the carrier in the transportation of the passenger."

Upon the evidence, I am constrained to find that this obligation of the carrier was not fully met in this case, and that in two particulars: *First,* in the absence of any nozzle attached to the hose; and, *second,* because the hose was so coiled and kinked that no water would flow through it until the kinks were got out of it by straightening it in the gang-way. Through these circumstances together the steam-pump, as I must find, was of no practical service. Rogers, the deck hand, shortly after leaving the slip, went to the pilot-house, smelt smoke, and was directed by the pilot to go below, and see what was the matter. He immediately went down two pair of stairs, leading through the center-house to the main deck. When going down the lower stairs, he saw, as he testifies, a small blaze of fire creeping upward along the northerly side of the center-house, from four to six feet above the main deck, and nearly opposite the smoke-stack; that is, outside of the jacket that surrounded it, and between that and

the steam-drum forward. He immediately shouted to the engineer below to turn on the fire-pump, which was done; and he grabbed the hose, which, as he says, was coiled up and hung upon a peg near the middle door of the center-house, at the foot of the stairs, and dragged the hose out on to the horse gang-way on the northerly side. The lower end of the hose was already attached to the standing pipe connecting with the steam-pump, as required; but the other end had no nozzle attached, and none was obtained in time to be attached. The reason for the absence of the nozzle was that it was customary to use the hose to wash the decks without a nozzle; and the hose had been coiled up and left as last used in that service, without the nozzle on. Although some varying statements are given by Rogers at different times, he says, in one passage, in answer to the question: "Did the water commence to come out of the hose before you took it off the pin, or after?" *Answer.* "As soon as I got the hose spread, so it wouldn't be kinked, or anything of that kind, the water come flying on to me." Other witnesses testify to aiding him in spreading the hose, and in getting the kinks out; and to the fact that during this time no water came through.

Several of the passengers who were upon that gang-way, and who testified to various other particulars in reference to the fire, saw no water played at all. Rogers says, and some other witnesses confirm him, that as soon as he got the kinks out the water came; and that he played, without the nozzle, upon the outside of the center-house, where, by that time, the fire had burned through; and that there was no difficulty in sending the water to the ceiling over the gang-way. I am bound to say, however, that in this part of his testimony Rogers seemed to be in difficulty; and his testimony was marked by such apparent constraint, uncertainty, and indecision as to make it doubtful, considering the contradictions in the testimony, whether he played the hose for any appreciable time before he was compelled by the heat to leave it. He estimates the time that he played the water at from one to two minutes; but, whether for a longer or shorter time, the hose was not used where it was most needed, namely, inside of the center-house where the fire was. The reason why the hose was not used there evidently was because it was not at first ready for immediate service. It had to be taken into the gang-way, straightened out, and the coils unkinked; and by that time, as it would seem, the fire had spread so rapidly that Rogers could not bear the heat at the center-house door, or, possibly, could not send the water without a nozzle to the point where he thought it most wanted. The time that it took him to get the hose playing he also estimates from one to two minutes. From the statements of other witnesses as to what they did after the fire broke out, and up to the time of leaving Rogers' side, before any water came through the hose, it is probable that the time was over two minutes; and this seems further probable from the circumstance that the fire had burned through the center-house, so

as to be seen from the gang-way by the time he got the hose ready to work.

Considering all the circumstances, I cannot regard such a condition of the hose and nozzle as meeting the requirement of the statute, or of reasonable diligence and prudence for the safety of human life. The same general rule of care applies to carriers of passengers on land and on the water. The degree of care and diligence must be commensurate with the dangers likely to be met. The readiness must be all that is reasonably practicable, and such as is likely to be of some actual use. In the overheated parts of a ferry-boat, like the center-house, where a small outbreak of fire will, if not checked, become in a few moments a great mass of flame, the requirement of "readiness for immediate service" is, in my judgment, not satisfied by anything less than a hose and nozzle kept in actual readiness for instant service; the nozzle being on, the hose attached to the pipe as this one was, and the hose also free from kinks, and kept so straightened out and arranged as that it may be directed upon the heated parts of the boat as soon as the steam-pump can be turned on. Had such been the preparations in this case, the evidence leaves no doubt that the fire could have been checked almost immediately, and within a minute after Rogers came down the second stairs. This could not have been later than the time when a bucket of water was thrown through the front window of the center-house, and seemed to the by-standers sensibly to have checked the fire. Rogers' description of the fire, as he saw it when he came down the second stairs, indicates that it had then made but little headway. Had the hose and nozzle been then stretched out, and thus in actual readiness for immediate service, he would within a few seconds afterwards have brought the hose to the center-house door and played directly upon the fire, which was then in a narrow compass, and have put it out, so that no considerable loss would have happened.

The best *data* furnished by the evidence as regards the time from the first alarm of fire to the arrival of the boat at her slip fully sustain, I think, the argument of the learned counsel for the petitioners. After the first alarm near Market street, the boat was probably stopped within a minute or a little over, in going through a space of perhaps 600 feet in the water; and under her reversed engines she was probably going full speed astern in about the same additional time and space. During these two minutes, or a little more, the tide would have carried the boat about 600 feet below Market street; and with her reversed speed, and the tide, she would have passed over the remaining distance to her slip in not exceeding two minutes more. While the shortness of the time within which the fire did its fatal work makes some of the other acts of negligence alleged evidently immaterial, that very fact emphasizes more strongly the necessity of keeping the appliances of the steam-pump in actual readiness for immediate service.

As to all the other charges of negligence in respect to the equipment, the rudder pin, and the handling of the vessel after the alarm of fire, I find that the petitioners and their servants and agents are not chargeable with fault contributing to the loss. I place my decision upon the single ground above mentioned, in order that if there be any error either in the principle adopted, or in its application to the facts, the error may the more easily be corrected on appeal.

A decree may be entered adjudging the petitioners liable to the claimants for the losses referred to with other provisions to be settled on notice.