### CHURCHILL et al. v. THE ALTENOWER.

### ADAM et al. v. THE ONTARIO.

*(Circuit Court, E. D. Louisiana.* June 13, 1889.)

**1. COLLISION—STEAMER AND VESSEL AT ANCHOR.**
   The bark O. was anchored in the South pass of the Mississippi river, about a mile above the jetties, close to the eastern bank, in the usual and proper place for vessels anchoring in the pass. She lay with helm lashed and bare masts. The steamer A. was coming down the pass in the middle of the channel, and when one-fourth of a mile above the O. the A's steering apparatus became deranged, because a nut worked off from one of the buckle screws attaching the starboard rudder chain. She became unmanageable and sheered towards the O. Her engines were reversed, and she was backed, but her headway was not lessened, and she struck the O's bow, causing damage to both vessels. The A. was furnished with an additional and after-steering gear, ready to be used, and taking but a moment to be put in gear for use, provided a man was standing by to put in the necessary pin. On this occasion no one was by, and, although it was connected before the collision, it was too late to have any effect. *Held,* that the A. was in fault. because her steering gear was not properly secured, watched, or inspected, and because she did not keep her after steering gear in readiness for instant use; and that the O. was not in fault.

**2. SAME—DUTY OF VESSEL AT ANCHOR.**
   As the A. approached the O. the master and others on board the A. called out to the O. to pay out her cable so as to drop astern, out of the way, but there was no watch on the O. to take such steps. The A. was nearly straight with the O., and the A's pilot. who was in charge of her navigation, gave no order to the O. to pay out cable, but was sailing the A. to pass the O. as she lay, and on the supposition that the latter should not move. Under the evidence it was doubtful whether dropping astern by the O. would have avoided the collision, or would have made it more certain and damaging. *Held* that, although the O. was in fault in not having an anchor watch, this did not contribute to the collision.

In Admiralty.

*James McConnell,* for libelants.

*Joseph P. Hornor,* for claimants and cross-libelants.

Before LAMAR, Justice; and PARDEE, J.

#### FINDINGS OF FACT.

PER CURIAM.   These causes came on to be heard on the libel, cross-libel, answers, record, and evidence, and were argued; whereupon the court doth find the following facts:

*First.* The Ontario, a British bark of ——— tons burden, and 170 feet in length, on her first voyage to the port of New Orleans, being in ballast and seeking a cargo, arrived at the mouth of the South pass of the Mississippi river on Friday, February 11, 1881; was towed in through the jetties and into South pass under the guidance of a bar pilot, and was by him placed and anchored, with a single anchor and chain, in said pass, about a mile above the jetties, close to, and broadside with, the eastern bank, not less than 500 yards above the light-house, and below the island at the head of the pass, in the usual and proper place for all vessels anchoring in the pass, and as required by the rules

and regulations established by the South Pass Jetty Company, and then in force under authority from the secretary of war, pursuant to the provisions of the act of congress approved June 1, 1874. Other vessels were anchored along the eastern bank, above and below the Ontario.

*Second.* After coming to anchor, as above stated, the Ontario lay with helm lashed and masts bare of sails; and remained so anchored until the next day, between the hours of 2 and 3 o'clock P. M., when she was run into by the British steam-ship Altenower, and so severely damaged on the port bow and side, just at and below the water-line, that she had, after being towed to the port of New Orleans, to be put in dock and repaired. The damage to both vessels was caused mainly by the anchor of the steam-ship Altenower, which, falling between the vessels as they collided, crushed in and tore asunder the wood-work of the hull of the Ontario, on her port bow and side.

*Third.* At the time of the collision the Ontario was well manned, officered, and equipped. The crew were all off watch, and were all below, except the steward, who was on deck, but not on duty. The captain had gone ashore to the telegraph station, situated at the head or inner end of the jetties, in order to communicate by telegraph with, and receive instructions from, the agents of the owners of the bark in New Orleans. The wife and three children of the captain of the Ontario were on board that vessel.

*Fourth.* At the time of the collision, the weather was sunlight, clear, and fair. South pass, above the jetties, is a narrow pass about 10 miles long, from 29¼ to 37 feet deep, and, at the place where the Ontario was anchored, 680 feet wide. The current was about three to four miles per hour. The wind was down the pass. The navigation of the pass is not dangerous, except to vessels drawing nearly the water of the shoalest parts of the channel, and is not dangerous to vessels at anchor along the eastern shore, except from the liability of large steam-ships going down the pass to sheer in shoal water, or to meet with accident to the steering apparatus, as in the case of the Altenower. Opposite where the Ontario was anchored the channel runs closer to the west side than to the east side of the pass.

*Fifth.* The damage to the Ontario resulting from the collision was the sum of $7,194.72.

*Sixth.* The Altenower was a British iron propeller steam-ship of ————— tons burden, and 340 feet in length, on voyage from New Orleans to Liverpool, and, at the time of the collision, was descending the South pass, about the middle of the channel, at the rate of between eight and nine knots an hour, and, when about one-quarter of a mile above where the Ontario lay, the steering apparatus in use on the Altenower became deranged, because a nut worked off from one of the buckle screws attaching the starboard rudder chain, *i. e.,* a nut fell off from the bolt that connected or held the chains by which the tiller of the steam-ship Altenower was operated, causing the steam-ship to sheer to port and become unmanageable; and ordinary attention and care was not used in securing the nut to prevent its falling off. As it was neither riveted

or pinned on, nor properly watched or inspected, the nut was liable to work off with the movements of the chain.

*Seventh.* The Altenower was furnished with an additional and after steering gear, ready to be used in case of need, and taking but a moment to put it in gear for use, provided a man was standing by to put in the necessary pin. On this occasion no one was by or near the said steering gear, and, although it was connected before the collision, it was not connected until after unnecessary delay, and until it was too late to affect the collision.

*Eighth.* As the Altenower sheered to port, and did not mind her helm, her engines were reversed, and she was backed, but her headway with the current was not lessened so but what she made towards the bow of the Ontario, which she soon struck with great force, inflicting the damage aforesaid, and damaging herself in the sum of $18,316.05.

*Ninth.* As the Altenower approached the Ontario, the master of the Altenower and others on board of her called out to the Ontario to light or pay out her cable, so as to drop astern, out of the way; but there was no watch on the Ontario to take any such step, and this hail of persons on the Altenower was disregarded. At this time the Altenower was nearly straight with the Ontario, and the pilot in charge of the navigation of the Altenower gave no order to the Ontario to pay out cable, but was managing and sailing the Altenower to pass by the Ontario as she lay, and on the expectation and supposition that the latter should not move; and, under the evidence in the case, it is uncertain and doubtful whether the dropping astern at this time by the Ontario would have avoided the collision, or would have contributed to make it more certain and damaging. The court, therefore, finds as a fact that, although the Ontario was in fault in not having an anchor watch at the time and in the place where she was anchored, yet that this fault did not, under the evidence in this case, contribute to the collision, and that, so far as said collision is concerned, the Ontario was not in fault.

*Tenth.* There is and was, near the mouth of the Mississippi river, a safe anchorage out of the track of vessels, where ships awaiting orders, or otherwise detained, can safely lie, *i. e.*, at the head of the passes, about 10 miles above where the Ontario was anchored, or outside of the jetties in East bay or West bay.

*Eleventh.* The failure of the Altenower to properly secure the nut described in the sixth finding was the immediate cause of the collision, and the failure to have a watch over the after steering gear contributed to the collision.

And the court finds, as conclusions of law:

*First.* That the Altenower was in fault, in that her steering gear in use was not properly secured, watched, or inspected; and because, when sailing through such a long, narrow, and shoal channel as the South pass she did not keep her after steering gear in readiness for instant use in case of emergency.

*Second.* That the Ontario was not in fault so far as the collision aforesaid was concerned.

*Third.* The libel filed by George and John Churchill against the steam-ship Altenower should be maintained, and that said libelants should have and recover from the claimants in this case, and their sureties on the release bond of the steam-ship Altenower, the sum of $7,194.72, with interest thereon at 5 per cent. from the 12th day of February, 1881, and all cost of suit.

*Fourth.* That the cross-libel filed herein by John Birney Adam, Alexander Chiras Adam, and Thomas Adam, Jr., owners of the steam-ship Altenower, against the bark Ontario, should be dismissed, with costs.

*Fifth.* The following decree should be entered in the case: Considering the aforesaid findings of facts and conclusions of law, the court doth order, adjudge, and decree that George and John Churchill, owners of the bark Ontario, libelants herein, do have and recover from the steam-ship Altenower the sum of $7,194.72, with 5 per cent. interest thereon from February 12, 1881, till paid, and all costs of suit. And whereas, said steam-ship Altenower was seized on the libel in this case, but was released and restored to her owners on giving bond and security to respond in damages, it is further ordered, adjudged, and decreed that John Birney Adam, Alexander Chiras Adam, and Thomas Adam, Jr., owners of said steam-ship Altenower, and claimants herein, and Bradish Johnson and Victor J. Meyer, their sureties on said release bond, be condemned *in solido* to pay the foregoing judgment: provided, however, that the said Victor Meyer and the said Bradish Johnson shall be held liable under the judgment only in the sum of $7,500 each. It is further ordered, adjudged, and decreed that the cross-libel of John Birney Adam, Thomas Adam, Jr., and Alexander Chiras Adam, filed herein, be dismissed, with costs. Execution may issue upon this judgment and decree after 10 days from filing hereof.