## VAN EYKEN v. ERIE R. CO.

(District Court, E. D. New York. July 30, 1902.)

1. COLLISION—DEFECTIVE STEERING GEAR OF TUG—DUTY OF INSPECTION.

On a steam tug owned by a railroad company, and used for towing car floats in the waters around New York City, the rod extending from the pilot house to the valve that put in operation the steam steering gear was made in sections, the upper section being connected to the one below it by means of a sleeve, which was fastened to the upper end of the lower section by a set screw. As the tug was passing up East river on a strong flood tide, having a loaded float on each side, the steering gear failed to work by reason of the set screw having become loose, allowing the sleeve to slip down and disconnect the rod, and through such fact, and the delay of the pilot in using the hand gear, one of the floats struck a pier, and broke her lines, and was then drifted by the tide against a vessel moored to an adjoining pier, causing serious injury. The connection was in a place where it could not be readily examined, and the testimony of claimant was that the screw was set two years before, and had not been inspected since, such inspection being considered unnecessary; but there were dents in the rod showing that the screw had been used several times upon occasions of either general or special examination. Held, that the tug was in fault for the collision, not only because of the negligent delay of the pilot in using the hand gear, but because of the failure to make proper inspection of the connection, which it was the duty of the owner to have made of a part so vital to safe navigation, especially in view of the service in which the tug was employed.

2. SAME—RIGHT TO LIMITATION OF LIABILITY—PRIVITY OR KNOWLEDGE OF OWNER.

A vessel owner, which employs competent persons to perform the duties imposed upon it as such owner, and to determine what such duties

are, may limit its liability in respect to damage caused by a collision which resulted from the failure of such persons to make or require proper inspection of the vessel, where such owner had no actual knowledge of the neglect, or the defect arising from it, although such lack of knowledge arose from inattention, or from necessity, owing to the magnitude of the owner's business.

**8. SAME.**

Where a tug was alone in fault for the breaking of the lines by which she was towing a barge, resulting in a collision between the barge and another vessel, and in proceedings in rem would alone have been liable, the owner of both tug and barge is required to surrender the tug only, in order to obtain a limitation of liability.

In Admiralty. Suit for collision.

Wing, Putnam & Burlingham, for libelant.

Wilcox & Green, for respondent.

THOMAS, District Judge. On the 15th day of May, 1901, a little before 4 o'clock in the morning, the tug Shohola, with car float No. 9 on her port side, and car float No. 13 on her starboard side, heading upstream, passed under the Brooklyn Bridge, and, when 300 or 400 feet off Catharine Ferry, while under one bell, ported her wheel for the purpose of rounding to and making a landing at Jay street, which is some 1,800 feet above on the Brooklyn side. The river at Jay street between piers is at least 1,200 feet in width. The strong flood tide sets from under the bridge upon and above Catharine Street Ferry. The tug was 102½ feet long by 22½ feet wide. The car floats were each 235 feet in length, and carried 12 empty cars. The Shohola has been valued at $16,000, car float No. 9 at $9,000, car float No. 13 at $14,500. When the pilot of the tug attempted to port his wheel, using the steam steering gear, his efforts were unavailing, and it was at once apparent that the gear was disordered. Thereupon the pilot signaled for the engines to go astern at full speed, which was done, and he also called to the engineer to inspect the steering chains. Thereupon the engineer went to the stern of the tug, looked at the steering chains, saw that they were taut, hastened to the forward part of the boat, made the same inspection with like result, called to the pilot to use the hand steering gear, and immediately shut off the steam which was furnished to the power steering gear,—an act erroneously regarded by the engineer and pilot as necessarily preliminary to the use of the hand gear. The hand gear was held by two wooden beckets and was lashed in addition. The pilot loosed and had it ready for action by the time the engineer reported, but in the meantime the tow had backed, and, before it could be controlled, the port car float collided with pier 31. This broke her lines, and she drifted on the tide, and collided with the stern of the steamship Folmina, lying within the slip on the lower side of pier 33, doing, as it is claimed, some $45,000 damages, which injury is the subject of recovery in this action. The cause of the accident was the disconnection of the rod that extended from the pilothouse to the valve that put in operation the steering gear. This rod

¶ 2. Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.

was in several sections, the lower end of the upper shaft or section fitting into a sleeve, so that it had free vertical motion, while the lower end of the sleeve held the upper end of another section of the shaft by means of a set screw passing through the sleeve and making a bearing against the shaft. Toward the end of each shaft were projecting keys, which fitted into the sleeve, and upon these the strain caused by the turning of the shaft to open the valve came, and there was no play as regards the lower section of the shaft, unless the keys became worn. This set screw had loosened, and allowed the sleeve to slip down from the lower end of the upper shaft, so that when the pilot attempted to turn his wheel he moved only such upper shaft, while the lower portion, connected with the valve, being disconnected, did not operate it. The steam gear was placed in the tug in 1893, and the same upper shaft, sleeve, and set screw had been in use from that time until the time of the accident; but in 1899 the shaft was lengthened, in connection with raising the pilot house, and the section thereof first below the sleeve was renewed. There were at least four very distinct dents or gouges in the lower rod, showing where, on several occasions, the screw had been set into it. It was claimed on the part of the respondent that the screw was never inspected, and that the steering gear, as regards the connections in question, had not been examined since 1899, although the tug was thoroughly overhauled once each year, and at times received slight repairs. The strain upon the shaft in the due performance of its function is not necessarily great, and its only office is to open and shut the steam valve in the steering gear. It is within the power of the engineer to throw the wheel quickly to one side or the other, with unnecessary violence; but there is a telltale connected with the wheel, that shows when there has been sufficient movement; and, while it is within the power of the pilot to exceed the due limit in the management of the wheel, yet even that should bring no considerable strain upon the shaft beyond the vibration which its connection with the machinery might cause. There is also expert evidence that the shocks to the boat might bring additional strain upon the rod and upon the set screw, but there is also evidence that this would produce no appreciable result. The set screw itself was in evidence; one witness for the respondent, a machinist, testifying that it showed wear at the end. Manton, the manufacturer of the gear, testifying that it showed no wear. The evidence generally on the part of the respondent was that the set screw was regarded as a permanent thing, and that it was not a subject of inspection; that, the longer it stayed in, the more secure it became on account of incurring rust. The respondent placed much value on rust as an agent of adhesion. Indeed, the sleeve in question was in a shaded recess, some four feet in height, and situated intermediate the deck of the pilothouse and the ceiling of the kitchen. There was no way of making an examination of the set screw without climbing into this recess and testing its proper adjustment. Hence, unless the screw did its own duty, there was no observed method nor practice of helping it. The general theory of the respondent's mechanics was to wait until something happened before the set screws were examined, and their alleged expectation

was that nothing would happen. The respondent claims to have set the screw properly two years before, and not to have inspected or disturbed it since. The screw was in a place where it could not be reached by a meddler, and yet the parts suddenly dropped away from each other. Upon this little set screw might depend the safety, not only of the tug and all controlled by it, but the life or property of others, as illustrated in the present instance. If the screw became loosened, the steering gear, without warning, would become disorganized, and the vessel would be at the mercy of the elements. And yet, with no inspection, no pretense of care in that regard, with the set screw placed out of reach in a darkened recess, this large and heavy tow was attempting a maneuver at a point in the river where the flood tide ran with dangerous swiftness. If it were true that a part so vital to safe navigation was never inspected, and had not been reset nor disturbed since 1899, still it should be considered that the respondent was negligent in failing to make such inspection. The respondent gives evidence that no inspection is required, and predicates this upon experience,—that such an accident had not happened before. If so, the respondent owes more to good fortune than to prudence. It was not the duty of the libelant to search through all vessels of this and other navigators for the purpose of discovering that a set screw so used has at some time given way. Even if that had happened once, or many times, proof might be difficult, if not impossible. The nature of the case teaches the necessity for care. That necessity is found in the vital function of the set screw, whose retention was related closely to safe navigation. But the shaft bears palpable evidence that this set screw had not been undisturbed since 1899, and that rust, with its unifying power, had not retained it in place. The dents are sufficiently far apart to show that the shaft had been shifted frequently in the sleeve, and that there had been readjustments of the parts. Why was it repeatedly set, unless the shaft as often had been loosened by accident or design? If it loosened so frequently from use, surely inspection was necessary. If it was released, and reset purposely, then some inspection was customary.

It is also urged that the respondent's pilot was negligent in his failure earlier to use the hand steering gear. He was in a very dangerous position in the river, with a tow not easily manageable at that point at the best; and when his power steering gear became useless the most ordinary prudence demanded that he should immediately employ the hand gear. But he delayed, first, to call for reversal of the engines, then for the engineer to make an inspection, and only acted after the engineer's report. There was not the slightest occasion for his waiting. The excuse of danger in the use of the hand gear before the steam to the power gear was shut off was without foundation, and the apprehension that difficulty would come from the use of the hand gear if the chain were out of order related merely to an inconvenience in readjustment, and not to any danger. Considering the fact that he was in a part of the river where he strictly had no right to be, that he was upon a perilous tide, setting hard upon the nearby pier, it seems that ordinary judgment required

greater expedition in the use of the hand gear. Therefore the respondent must be found in fault for negligence in failure to inspect, and negligence on the part of the pilot in the due use of the hand gear. The contention that a nut or screw in machinery subject to use would not loosen, and that it would be timely to look after it after the event, is not in accordance with usual legal holding. The Altenower (C. C.) 39 Fed. 118; The Aggi (D. C.) 93 Fed. 484, affirmed in 46 C. C. A. 276, 107 Fed. 300.

May the respondent limit its liability, and, if so, should the tug alone be surrendered? The libelant contends that, as the duty of providing a seaworthy vessel rested upon the owner, and as there was no system of inspection, there was "privity or knowledge" on its part that should preclude its limiting its liability, and for this relies upon In re Myers Excursion & Navigation Co. (D. C., 1893) 57 Fed. 240, affirmed The Republic (1895) 9 C. C. A. 386, 61 Fed. 109 (Second Circuit); The Garden City (D. C., 1866) 26 Fed. 766; while the respondent refers to Quinlan v. Pew (1893) 5 C. C. A. 438, 56 Fed. 111 (First Circuit); The Annie Faxon (D. C., 1895) 66 Fed. 575 (Ninth Circuit), affirmed in 21 C. C. A. 366, 75 Fed. 312; Tyne Steam Shipping Co. v. British Shipowners' Co., 5 Asp. 194, affirmed under title of The Warkworth (1884) 9 Prob. Div. 145. In re Myers Excursion & Navigation Co., supra, affirmed by the circuit court of appeals of this circuit, upon the ground that it was proven that the owner knew of the defect which made the vessel unseaworthy, Judge Wallace stated:

"We do not find it necessary to consider whether a shipowner is denied the protection of the statute whenever the loss has occurred from the unseaworthy or defective condition of his vessel. The warranty of seaworthiness which is always implied on the part of the shipowner holds him to the obligation of providing a vessel which is in all respects reasonably fit for the voyage and employment in which she is to engage. Yet there may be a breach of this obligation without his knowledge, and without his personal negligence. He may have employed a most competent expert to make all necessary examination of the vessel just prior to the voyage,—an expert possessing skill and experience far beyond his own,—and the expert may have failed to exercise sufficient care to discover defects which ought to have been found. It would be a hard construction of the statute which would deprive the shipowner of protection under such circumstances."

In the case at bar the respondent's contention is that it was no part of its policy to inspect the set screws, that the superior agents in the mechanical department knew that it was not done, and did not intend to have it done, because, in their judgment, inspection was unnecessary. Hence, if this omission was negligent, the corporation had constructive knowledge of the omission, and to it the negligence of employés was imputable according to usual rules. Although the corporation, through its agents, was negligent in the matter of inspection, there is no evidence that it actually knew of the failure to inspect; nor was actual notice of the defect in the shaft brought home to the corporation, its officers, managers, or subordinate agents or servants. No one knew, because no one took the slightest pains to discover. The respondent is one of the large railway companies in the United States. Of necessity it delegates the duty of inspecting

machinery, discovering defects, and repairing the same, to agents of varying degrees of authority; and to those servants also must be left the duty of determining when inspection is necessary, how often it shall be repeated, and how it shall be made. It would be impossible for the owner, or the higher officers, to have direct knowledge either of the adoption or failure to adopt a system of inspection, or of omission to enforce the same. Undoubtedly, the negligence of a servant would be imputable to the master, and the actual knowledge of a servant may be the constructive knowledge of the master. The neglect to provide rules for inspection, and to inspect accordingly, ordinarily would impose liability upon the master; and there may be some difficulty in reaching a logical conclusion that the master may, through the magnitude of his undertakings, deprive himself of all opportunity of personal knowledge of the condition of his vessels, and base his exemption from personal liability upon such purposed, and maybe necessary, ignorance. But the decisions in Quinlan v. Pew and The Annie Faxon, supra (and In re Myers Excursion & Navigation Co. is not adverse), are understood to hold that, if the owner select a proper person to perform the duty imposed upon the owner, and such person neglect the same, and the owner be unaware of the neglect or the defect that arises or continues from it, such owner may limit his liability. It seems to be the policy of the law to augment the shipping interests at the expense of private persons suffering damage from the tortious acts or omissions of shipowners and their servants, and to permit shipowners to limit their liability, in case they delegate their duties to competent persons, and escape through inattention or necessity actual knowledge of the manner in which the delegated duty is performed. It may be, however, that the neglect to know might be so gross as to deprive the owner of the privileges of the act. This state of the law enables the present respondent to limit its liability.

The remaining question relates to the necessity of surrendering barge No. 9 in addition to the tug. The libelant suggests this upon the theory that the barges and tug "formed a common united instrument of commerce, moving as an entirety, when the tort was committed, although afterwards separated in the successive collisions." The Bordentown (D. C., 1889) 40 Fed. 682; The Columbia (1896) 19 C. C. A. 436, 73 Fed. 226. Generally, in collisions the tug has been regarded as the responsible actor. In the present case the proximate cause of the injury was the disordered steering gear, and in rem the tug alone would be liable. The fact that the defective condition of the tug enabled her tow to collide with the pier, and become detached, and injure another vessel, did not make the presence or movement of the tow a primary agent in effecting the injury. The presence of the barges was a part of the condition under which the wrongful act or omission took effect. It was not a part of the wrongful act. Therefore it is concluded that the respondent may limit its liability upon surrendering the tug.