SPOKANE & I. E. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. January 5, 1914.)

No. 2,258.

1. STREET RAILROADS (§ 73*)—SAFETY APPLIANCE ACT—"USED ON STREET RAILWAYS."

The words "used on street railways," employed in Safety Appliance Act, Congress March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1314), exempting such cars from the operation of the act, means those cars which at least are used on such railways in street railway traffic and do not include cars of an interurban line engaged in interstate commerce, though they are also run for a small portion of the distance over a street railway track to reach the terminal in the center of the city.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 153; Dec. Dig. § 73.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. EVIDENCE (§ 513*)—EXPERTS—SUBJECT OF EXPERT TESTIMONY.

In an action by the government to recover penalties for failure of an interurban railway company to equip cars, used in interstate commerce, with proper handholds and grabirons as required by Safety Appliance Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1314), whether openings in the buffer on the ends of the cars afforded the security intended by the act, so as to constitute a substantial compliance therewith, was not a proper subject for expert testimony, but was for the determination of the jury under the evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2317, 2318; Dec. Dig. § 513.*]

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by the United States against the Spokane & Inland Empire Railroad Company. From a judgment for the United States (206 Fed. 988), defendant brings error. Affirmed.

Graves, Kizer & Graves, of Spokane, Wash., for plaintiff in error.

Oscar Cain, U. S. Atty., of Spokane, Wash., and Philip J. Doherty, Special Asst. U. S. Atty., of Washington, D. C.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The plaintiff in error was at the times here in question a common carrier engaged in interstate commerce by means of an electric railroad between the city of Spokane, in the state of Washington, and Cœur d'Alene city in the state of Idaho, and for alleged violations of the act of Congress known as the Safety Appliance Act, approved March 2, 1893 (chapter 196, 27 Stat. 531), as amended April 1, 1896 (chapter 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3174]), and as further amended March 2, 1903 (chapter 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1911, p. 1314]), the present action was brought by the government, the complaint in which action contains 15 counts, the first 12 of which allege in substance that the violation of the statute consisted in hauling over its road certain designated cars which were not provided with the grabirons or handholds required by the statute, and the last 3 of which alleged in substance the violation of the statute to have consisted in hauling over its road certain designated cars not provided with the automatic couplers thereby required. The case was tried with a jury, which returned a verdict against the railroad company upon which judgment was given against it, resulting in the present writ of error in its behalf.

[1] It is first urged that the cars in question do not come within the provisions of the Safety Appliance Act, and, second, that the trial court erred in refusing to permit the railroad company to introduce certain testimony, and in its instructions to the jury.

The first point thus urged is based upon the exception contained in section 1 of the act of March 2, 1903, excepting from the operation thereof cars "which are used upon street railways." The section reads as follows:

"Be it enacted by the Senate and House of Representatives. of the United States of America in Congress assembled, that the provisions and requirements of the act entitled 'An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes,' approved March second, eighteen hundred and ninety-three, and amended April first, eighteen hundred and ninety-six, shall be held to apply to common carriers by railroads in the territories and the District of Columbia and shall apply in all cases, whether or not the couplers brought together are of the same kind, make, or type; and in the provisions and requirements hereof and of said acts relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and the District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith, excepting those trains, cars. and locomotives exempted by the provisions of section six of said act of March second, eighteen hundred and ninety-three, as amended by the act of April first, eighteen hundred and ninety-six, or which are used upon street railways."

These, among other, facts appear from the undisputed evidence:

In addition to its interurban lines, one of which extends from Spokane to Cœur d'Alene, a distance of about 40 miles, the plaintiff in error owns the street railway system in Spokane. The interurban line extending to Cœur d'Alene is of standard gauge and of standard weight of rails. The superintendent of that system testified, among other things, as follows:

"My superintendency is over the interurban lines. I do not control the street railway lines. On the interurban lines tickets are sold for particular stations the same as a railroad. We handle baggage for our passengers.. Our trains are made up according to standard railroad rules, with markers to designate the trains, and are run on schedules and by train orders. The employés who are engaged in the street car service do not have anything to do with the operation of the interurban service. They use the same tracks, however, that come from the freight depot to the passenger terminal in the heart of the city. We do not take passengers on the interurban trains within the city limits exclusively. We receive passengers at points within the city limits for transportation outside, and drop passengers on interurban trains at various points within the city, but within the city limits we do no strictly street-car business."

The trains of the company in which were the cars here in question leave its passenger depot near the center of Spokane, and go out over the tracks of the company's street railroad system for a little over a mile to the yards of the company, where they take the direct line to Cœur d'Alene, which is on the company's private right of way. Those of the cars in question which are mentioned in the first 12 counts of the complaint are large passenger coaches having no grabirons or handholds on the ends of the cars; instead, on their ends there is a radial coupler and a heavy steel sill or buffer, round on the corners, in which buffer or sill, on the passenger coaches, there are, on each side of the coupler, openings measuring from 18 to 22 inches in length, and from 2¼ to 3 inches of clearance, but on the baggage and mail cars the sill or buffer is solid.

The three cars mentioned in the last three counts of the complaint, and which it appears were brought into the interurban service because

of a pressure of traffic, were street railway cars which not only had no automatic couplers thereon, but, because of their small size, were incapable of having them.

There is testimony to the effect—and none to the contrary—that the sharpness of the curves on the street car line is such as to make it impossible to run cars over that line having grabirons or handholds on the end of the cars. Conceding that to be true, it is no answer to the government's action if the act of Congress in question is applicable to the company's interurban lines. To hold with the plaintiff in error on this point would be to hold that, because the company uses the tracks of its street car lines for a mere trifle of the distance between its terminal points in order to reach the center of the city of Spokane, its entire interurban line, which has all of the characteristics in build and operation of a standard steam road, is not subject to the Safety Appliance Act. That would indeed be a case of "the tail wagging the dog."

We are of the opinion that the act of Congress does not admit of such an interpretation, especially in view of the manifest purpose of the legislation. The exception from its operation of cars "used upon street railways" we think means, if not those solely used on street railways, at least such as are used on such railways in street railway traffic, which was not the case here, according to the testimony of the company's own witnesses.

In Moore et al. v. American Transportation Co., 24 How. 1, 16 L. Ed. 674, the Supreme Court in speaking of that provision of the Act of March 3, 1851, c. 43, 9 Stat. 635, entitled "An act to limit the liability of shipowners, and for other purposes," which declared, "This act shall not apply to the owner or owners of any canal boat, barge, or lighter, or to any vessel of any description whatsoever, used in rivers or inland navigation," said:

"This word 'used' means, in the connection found, 'employed,' and doubtless, in the mind of Congress, was intended to refer to vessels solely employed in river or inland navigation."

The use of such interurban cars as we have here, engaged as they are in interstate commerce, for a comparatively short and relatively inconsiderable distance on a street railway in order to reach the city terminus of the company handling no street car business, can hardly be considered an intermingling of traffic; but if so it would, in our opinion, no more make inapplicable the Safety Appliance Act to the interurban line than does the intermingling of intrastate with interstate traffic defeat the power of Congress over the latter. See Baltimore & Ohio R. Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878; Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72.

We also regard as tending to support our conclusion in this respect the decision of the Supreme Court in the case of United States v. Atchison, Topeka & Santa Fé Ry. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361, where that court had under consideration that provision of the Act of March 4, 1907 (34 Stat. 1415, 1416), making it unlawful for common carriers subject to the act to permit any employé subject

thereto to be on duty for a longer period than 16 consecutive hours, or after that period to go on duty again until he has had at least 10 consecutive hours off duty, or 8 hours after 16 hours work in the aggregate, with certain exceptions not necessary to be mentioned, in which case the court said:

"A trifling interruption would not be considered, and it is possible that even three hours by night and three hours by day would not exclude the office from all operation of the law, and to that extent defeat what we believe was its intent."

[2] The rulings and instructions of the court below remain to be considered. During the trial the witness Robertson testified, among other things, that he had been employed for 23 years as brakeman, switchman, yardmaster, and conductor, and had had a great deal of experience in coupling and uncoupling cars, and was familiar with the types of handholds ordinarily provided on steam railroads for the security of men going between the cars, and that generally there is uniformity in such appliances and the place of their location; that, "where there is a handhold on passenger coaches on steam roads, it is about midway from the bottom of the wooden sill to the bottom of the car above the track. The handholds that are used on steam railroads are about the height of my shoulder above the track. I am 5 feet 10 or 11 inches, and the handhold would strike me just about the shoulder. I have examined the passenger coaches on the Spokane & Inland Empire Railroad Company with reference to the openings which it claims is a handhold in the buffer or sill of their cars."

The record proceeds:

"Thereupon counsel for defendant asked the witness then on the stand this question: 'What would you say of them as a safe and proper appliance, one that would tend to preserve men from injury who might have to go between the cars for any purpose?' Plaintiff's counsel thereupon objected to the question, stating that, 'The question is, is it a hand hold?' The court sustained the objection 'on the ground that it invades the province of the jury'; that defendant was seeking to prove by the witness the very question that the jury were to decide. Counsel for defendant thereupon made the following offer of proof: 'Now, if your honor pleases, I offer to prove by the witness on the stand, and I will call other witnesses, and particularly experienced railroad men, of years of experience, to prove by him and by them, by questions and answers addressed to them, that the opening in the beam or buffer of these electric cars is intended to subserve and does subserve the same purpose as the round iron appliance that is prescribed by the rules of the Interstate Commerce Commission at the present time and is in use on steam railroads, that it is a better appliance than these are for the purpose of protecting men from injury who have to go between the cars. I offer to prove that and to ask questions of this witness to that effect.' Thereupon counsel for plaintiff objected to the offer, and the court sustained the objection upon the ground that it was not a question for expert testimony, but was a matter of common knowledge"—to which ruling the defendant excepted.

Another witness, Arlington Mahan, who was general foreman in the shops of the plaintiff in error, testified, among other things, as follows:

"I am familiar with the passenger coaches of that company that have a buffer at the end and an opening in it. I was in the employ of the company at the time these cars or some of them were purchased. The openings were in the beam or sill when the cars were received. There were handholds up and down on the sides of the cars when they were received. There were none on the ends of the cars in the place where they are put on steam cars.

I know of no reason for the openings on top of the angle iron on that beam. The men use them for grabirons whenever they have occasion to couple or uncouple cars, or go between them. I have had occasion to couple and uncouple cars in that yard and other yards."

The record proceeds: ·

"Thereupon counsel for defendant asked the following question: 'Does that opening in the top of the sill serve the same purpose, and is it as well fitted for the purpose of protecting the lives and limbs of men who have occasion to go between the cars in the exercise of their duties as the form of grabirons that is used on steam cars, that is brought below the end of the car?'

"Counsel for plaintiff objected to the question, and the court sustained the objection on the following grounds: 'I am of the opinion that this is one of the cases where witnesses must state facts and not conclusions, whether that is a reasonably safe appliance is within the knowledge of the ordinary man and no special experience is required.'

"Thereupon defendant asked and was allowed an exception to the ruling. The witness further testified: 'I am familiar with the form of grabiron or handhold that is used on the passenger cars of steam railroads. It is attached to the end of the car, one on each corner, and projects downward. The Interstate Commerce Commission requires that they shall have a clearance of at least 2 inches, preferably 2½, below the car sill. The handle runs different lengths. The Interstate Commerce Commission requires that it shall be not less than 16 inches inside clearance. There is one of these on each side of the drawbar. The opening in the angle iron in that buffer on the Spokane & Inland Empire cars runs in length from 16 to 24 inches. It is from 2½ to 2¾ inches wide, and there is one of such openings on each side of the drawbar on both ends of the car, making four in all. It would be impossible to put on the passenger cars of the defendant such grabirons as are in use on the cars of steam railroads because in going around the curves on the city streets the coupler would strike a brake.'

"And thereupon the following question was asked and the following matters occurred:

"'In your opinion, Mr. Mahan, and observation of these cars, is the opening in the angle bar a better and safer appliance for the safety of persons having occasion to go between the cars in the discharge of their duties than those that are used upon steam railroads?'

"Mr. Doherty: 'The question is objected to.'

"The Court: 'I will sustain the objection.'

"Mr. Graves: 'To which we take an exception.'

"Mr. Graves: 'I now offer to prove by this witness and also by other witnesses called, with your honor's permission, that the opening in this angle iron or sill or buffer is a better and safer appliance, better protection, greater protection to the men who have occasion to go between the cars than any form of grabiron or handhold that is known in railroad circles.

"Mr. Doherty: 'I object to that.'

"The Court: 'Objection sustained on the ground that it is a question for the jury.'

"Mr. Graves: 'To which the defendant excepts.'"

In its instructions to the jury regarding this matter, the court told them that the act of Congress relative to safety appliances provided that railroad cars "used in interstate commerce shall be provided with secure grabirons or handholds on the ends and sides of each car for greater safety to men in coupling and uncoupling cars," and instructed them as follows:

"The purpose of the act is to afford greater security to men coupling or uncoupling cars by reason of the presence of grabirons or handholds, than would be possible if there were nothing of the sort on the ends of the cars. If you should find from the evidence in this case that although there might not have been on the ends of the cars referred to anything which would be

known technically as grabirons or handholds, yet if there were upon the ends of such cars an appliance which could be used as a grabiron or handhold and which would afford as much security to men coupling or uncoupling the cars as would be afforded by having what would be technically known as grabirons or handholds on the ends of the cars, then your verdict should be for the defendant. The law does not require any particular kind of grabiron or handhold to be placed upon the end of the car, but only requires that some such appliance shall be placed there which will afford the person coupling or uncoupling cars equal security with that which would be obtained by the method I have given. Gentlemen, you have heard the testimony in this case, and you have examined the handholds in question, and it is for you to say from that testimony and from your personal examination of the cars whether the appliance provided by this company complies with the act of Congress; in other words, whether it affords that safety and protection to employés which the law contemplates and requires. The burden is upon the government to establish its case by a preponderance of the testimony. If, from a preponderance of the testimony offered herein, you are satisfied that the defendant has not furnished grabirons or handholds as I have defined these terms to you within the meaning of the law, you will find the defendant guilty on the first twelve counts."

We are of the opinion that the plaintiff in error has no valid ground of objection to these instructions, and agree with the trial judge that the question as to whether the openings in the buffer on the ends of the cars afforded the security intended by the act of Congress was not the subject of expert testimony, and that the personal inspection of such openings by sensible jurors was a safer guide to the truth in regard to the matter than the mere opinion of witnesses.

The judgment is affirmed.